The STATE, ex rel. CELEBREZZE, Atty. Gen., Appellee,

v.

THERMAL–TRON, INC. et al., Appellants.

[Cite as *State, ex rel. Celebrezze, v. Thermal–Tron, Inc.* (1992), 71 Ohio App.3d 11.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59732.

Decided Jan. 16, 1992.

12

*Lee I. Fisher*, Attorney General, *Christopher J. Costantini, Patricia A. Delaney* and *Christopher Korleski*, Assistant Attorneys General, Environmental Enforcement Section, for appellee.

*Allen & Hodgman, Bruce C. Allen* and *Blair Hodgman*, for appellants.

ANN MCMANAMON, Judge.

The Attorney General for the state of Ohio, Anthony J. Celebrezze, Jr., sued Thermal–Tron, Inc. and its president, Akram Habib, for operating two infectious waste incinerators in contravention of Ohio EPA air contaminant emission standards and the terms of the company's permit to install. (R.C. 3704.05[A], [C] and [H].) Following a bench trial, the court entered a verdict for the Attorney General, enjoined the operation of the Thermal–Tron incinerators, and ordered the defendants to pay a $41,300 fine. In a timely appeal, Thermal–Tron and Habib raise six assignments of error.[1] Upon a review of the record, we affirm.

In their first assignment of error, Thermal–Tron and Habib challenge the trial court's finding that the company operated in violation of R.C. 3704.05.

A reviewing court will not reverse a judgment supported by competent, credible evidence as to each material element of a case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Every reasonable presumption must be made in favor of the judgment and if the evidence is susceptible of more than one construction, this court must give it that interpretation most consistent with the verdict. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Finally, the determination of witness credibility rests with the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212.

R.C. 3704.05 states, in relevant part:

"(A) No person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection under division (E) of section 3704.03 of the Revised Code, unless the person is the holder of a variance issued under division (H) of section 3704.03 of the Revised Code, permitting the emission of the contaminant in excess of that permitted by the rule.

"* * * *

"(C) No person who is the holder of a permit issued under division (F) or (G) of section 3704.03 of the Revised Code shall violate any of its terms or conditions.

"* * * *

"(H) No person shall violate any order, rule, or determination of the director issued, adopted, or made under this chapter."

---

1. See Appendix.

In March and May 1987, the Ohio EPA issued permits to Thermal–Tron to install two incinerators at the company's Cleveland facility. The permits provided for a Total Suspended Particulates ("TSP") limit of .1 pound per one hundred pounds of waste charged; a hydrogen chloride ("HCl") limit of four pounds per hour; and no visible emissions or odors in the exhaust gases of the incinerators. Thermal–Tron was required to demonstrate compliance with these emission limits through stack tests. The permits also prohibited the burning of Type V and/or Type VI wastes until performance tests were conducted on these wastes. Finally, the permits provided that the company was to apply for conditional permits to operate pursuant to Ohio Adm.Code 3745–35–02(H).

After receipt of the permits to install, Thermal–Tron began stack tests on incinerator No. 1. The first test was conducted on November 30, 1987 and revealed TSP emissions of .23 pounds per one hundred pounds of waste and 4.89 pounds per hour of HCl. In a January 29, 1988 letter to Habib, the Cleveland Division of Air Pollution Control ("DAPC") found that this stack test failed to demonstrate compliance with the emission limits. The letter further noted Thermal–Tron's failure to apply for a conditional permit to operate and stated:

"Further, the subject incinerator should only be operated in the interim for 'shake down' purposes in preparation for testing since any other operation may subject you to enforcement actions and civil penalties."

Two days later, Habib sent a letter to the DAPC, requesting a conditional permit to operate and outlining changes he intended to institute in order to bring the incinerator into compliance. Habib subsequently provided the DAPC with further information as requested but no action was taken on the conditional permit. On March 22, 1988, the DAPC, however, forwarded an "Enforcement Action Request" to an EPA staff attorney.

Habib subsequently installed a scrubber system on incinerator No. 1 and scheduled a stack test for June 29, 1988. The test revealed HCl emissions of .5 pounds per hour, but the TSP level exceeded permissible limits. Habib informed the DAPC of intended modifications and scheduled a third stack test for October 12, 1988. This test also failed to demonstrate compliance with the TSP emission limits. The record demonstrates Thermal–Tron successfully completed a stack test for both TSP and HCl in August 1989, six months after the Attorney General filed this action against the company.

The Attorney General presented evidence at trial that Thermal–Tron operated from September 1987 through March 1988 and from September 1988 through February 7, 1989, despite its lack of a conditional permit to operate and its failure of three stack tests. Douglas Seaman, Chief of the Bureau of

Industrial Air Pollution for the city of Cleveland, reviewed Thermal–Tron's waste manifests, burn logs and temperature recording charts and testified that the company was involved in actual operations four to eight hours a day, five days a week. In addition to the hours and regularity of operations, Seaman based his conclusions on the volume of waste burned. The Attorney General presented hundreds of waste manifests detailing the type and amount of waste received by Thermal–Tron from area hospitals and other waste generators. Finally, Seaman testified a required performance test for cobalt was not conducted until November 20, 1988.

John Curtain, an engineer with the Cleveland DAPC, testified that "shake-down" or "debugging" operations are conducted before stack tests to determine whether the equipment is performing properly. He told the court it is not necessary to use actual medical waste or to run an incinerator eight hours a day for shakedown purposes. Curtain also averred that on February 24, 1989, he met with Habib at Thermal–Tron and observed the presence of boxes of medical waste and that incinerator No. 1 was operating. Finally, Curtain explained that cobalt recovery operations in the incinerator would involve the burning of Type V waste and possibly Type VI waste if particulate matter were present. Seaman previously testified that he believed heavy metals would be found in the filters after the cobalt recovery process.

Although Habib admitted Thermal–Tron incinerated medical waste and confidential FBI papers, he told the court that the company was involved only in shake-down procedures. Habib identified the waste manifests and temperature charts and admitted that temperatures of two thousand degrees, as depicted on the charts, indicated waste was being charged. He also testified to all the steps and expenses he undertook to bring incinerator No. 1 into compliance with the emissions standards. Finally, Habib acknowledged that Thermal–Tron was involved in cobalt recovery through the incineration of material received primarily from petroleum refineries. Temperature charts demonstrated cobalt recovery operations occurred on forty-two occasions before the November 1988 performance test.

In light of the record, particularly the testimony of Seaman and Curtain as well as the waste manifests, temperature charts, and operating records, we find competent, credible evidence to support the trial court's finding that Thermal–Tron was operating in violation of R.C. 3704.05. The court was free to disbelieve Habib's claim that only shake-down operations were conducted. *DeHass, supra.* We further reject Habib's argument on appeal that his efforts to comply with the emission standards excuse his actions.

Accordingly, this assignment of error is overruled.

In their second assignment, Habib and Thermal–Tron assert the court impermissibly admitted the testimony of Thomas Rigo and the federal EPA's civil penalty policy. They also claim the court erroneously applied an Ohio EPA penalty policy adopted after the violations occurred.

Over defense objections, the court permitted Thomas Rigo, an Ohio EPA official, to testify as to the federal EPA's civil penalty policy. Rigo told the court that since late 1988 the Ohio EPA followed the federal EPA's guidelines on civil penalties. These guidelines entail consideration of the economic benefit the company derived during the period of violations, the severity of the violations, including harm to the environment, duration of non-compliance, and the willfulness of the violations. Rigo outlined different methods to compute the penalty for Thermal–Tron's violations, but recommended the use of gross revenues for calculating the economic benefit. Under this approach, Rigo opined the penalty should equal $449,787. Habib and Thermal–Tron argue Rigo's testimony was improper because it "usurped" the court's responsibility to determine the penalty.

R.C. 3704.06 provides that the trial court shall have the jurisdiction to require payment of a civil penalty of not more than $25,000 for each day of each violation. It is well established that the amount of such a penalty lies within the discretion of the trial court. *State, ex rel. Brown, v. Dayton Malleable* (1982), 1 Ohio St.3d 151, 157, 1 OBR 185, 190, 438 N.E.2d 120, 124–125; *State, ex rel. Brown, v. Howard* (1981), 3 Ohio App.3d 189, 3 OBR 216, 444 N.E.2d 469. Nothing in the record indicates the court merely adopted any of the approaches described by Rigo or set forth in the federal EPA civil penalty policy statement. The court explicitly rejected Rigo's recommendation to use gross revenues and stated:

"Now there was much discussion whether the Court should automatically penalize the defendant in the amount of gross receipts realized during the unlawful operation which the State of Ohio suggests is appropriate.

"The defendant suggests that it did not realize any economic benefit but that it incurred $71,478.35 of expenses as a result of the installation of the scrubbers and other anti-pollution devices.

"The Court cannot intelligibly assess an approximate penalty applying either approach.

"The Court does find that the defendant operated illegally for an 11 month period, and realized economic gain during this period. The company profited $41,060 in fiscal years 1987 and 1988, (24 months). The Court will therefore assess the penalty of $19,000.00 as economic benefit realized as a result of delay in compliance."

██ The court's opinion demonstrates it considered the factors in the federal EPA penalty policy. We find no error in this regard since the court exercised its own discretion in fashioning the penalty. Furthermore, considerations of financial gain to the defendant and environmental harm are appropriate in assessing penalties in pollution cases. See *Howard, supra,* at 191, 3 OBR at 217–218, 444 N.E.2d at 471.

Finally, we reject the defendants' argument that the application of the federal EPA guidelines violates Section 28, Article II of the Ohio Constitution prohibiting retroactive legislation. Their position is based upon the fact that the Ohio EPA began using the federal EPA guidelines only in late 1988. The record demonstrates that, although Thermal–Tron's violations began in late 1987, they continued until February 7, 1989. Furthermore, the court did not adopt any policy requiring greater penalties. As previously noted, the court merely considered factors outlined in the federal EPA policy and then fashioned a penalty within the confines of R.C. 3704.06.

This assignment of error is overruled.

In their third assignment of error, Thermal–Tron and Habib assert that Ohio EPA enforcement policies violate their equal protection rights.

The defendants argue Thermal–Tron was singled out for harsher penalties as opposed to other businesses which allegedly were either not penalized or received lesser fines. The defendants claim the actions of the Ohio EPA amount "to the deliberate destruction of this small, minority enterprise" and violate their right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 2, Article I of the Ohio Constitution. We agree with the Attorney General that the defendants' argument is based upon a theory of selective enforcement.

██ "[T]he conscious exercise of some selectivity in enforcing a statute fair on its face does not in and of itself amount to a constitutional violation." *Whitehall v. Moling* (1987), 40 Ohio App.3d 66, 69, 532 N.E.2d 184, 188, citing *Oyler v. Boles* (1962), 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446. For selective enforcement to constitute a denial of equal protection, the defendants must demonstrate purposeful or intentional discrimination. *Snowden v. Hughes* (1944), 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497. This burden is not satisfied by "a mere showing that another person similarly situated was not prosecuted * * *; a defendant must demonstrate actual discrimination due to invidious motives or bad faith. Intentional or purposeful discrimination will not be presumed from a showing of differing treatment." *State v. Freeman* (1985), 20 Ohio St.3d 55, 58, 20 OBR 355, 357, 485 N.E.2d 1043, 1046, citing *Snowden, supra,* 321 U.S. at 8–9, 64 S.Ct. at 401, 88 L.Ed. at 503. Finally, a defendant

prosecuted under a regulatory statute is not relieved of this burden. *Moling, supra,* 40 Ohio App.3d at 70, 532 N.E.2d at 188–189.

■ The defendants presented evidence that other businesses involved in the incineration of waste were either not prosecuted or received lesser fines. The defendants, however, did not demonstrate that other alleged violations were similarly situated with Thermal–Tron. For example, the BFI facility in Warren, Ohio, had passed a stack test although it operated without a permit. Thermal–Tron did not pass a stack test during the violation period. The BFI facility in Cleveland continued its operation after its permit expired and was fined $28,000. Thermal–Tron never obtained a permit to operate. Even assuming, *arguendo,* that Thermal–Tron demonstrated it was situated similarly to these other businesses, nothing in the record indicates the Ohio EPA acted with invidious motives or bad faith. *Freeman, supra.* Thus, we find no violation of the defendants' equal protection rights.

This assignment of error is overruled.

In their fourth, fifth and sixth assignments of error, Thermal–Tron and Habib challenge the $41,300 fine. We will address these assignments concurrently.

■ As previously noted, the assessment of an appropriate penalty lies within the discretion of the trial court. *Dayton Malleable, supra,* 1 Ohio St.3d at 157, 1 OBR at 190, 438 N.E.2d at 124–125; *Howard, supra,* 3 Ohio App.3d at 191, 3 OBR at 217–218, 444 N.E.2d at 471. Absent a finding that the court acted in an unreasonable, arbitrary or unconscionable manner the fine will not be disturbed. *Malleable, supra.* Finally, R.C. 3704.06 empowers a court to impose a $25,000 fine for each day of violations.

Monetary penalties are designed to deter conduct which is contrary to a regulatory scheme. *Howard, supra.* To be an effective deterrent, penalties must be large enough to hurt the offender. *Id.* In assessing the appropriate penalty, a court should consider the good or bad faith of the defendant, the financial gain to the defendant as well as environmental harm. *Id.*

The court allocated the $41,300 fine as follows: $12,300 for the risk to the environment, $19,000 for economic benefits and $10,000 for the defendants' indifference to the law.

■ The defendants initially challenge the court's use of net profits to determine the economic benefits. In its opinion, the court found that the defendants illegally operated for eleven months between September 1987 and February 1989, and that the company had net profits of $41,060 in 1987 and 1988 (twenty-four months). We find that the court reasonably fined the defendants $19,000, an amount approximately equal to the net profits the

company earned while operating in violation of R.C. 3704.05. The defendants argue the court should have used the federal EPA policy which provides for a fine equal to the amount of interest the company could earn on the capital costs of pollution control equipment not installed. Such a penalty has little application to this case since Habib made modifications and installed equipment after the failed stack tests. Rather, the charges against the defendants are based upon the operation of the incinerators without a permit and before the company's incinerators passed a stack test and performance test for the incineration of Type V and VI waste. Thus, a fine based upon net profits earned during this period of illegal operation is appropriate.

■ The defendants also challenge the court's imposition of a $12,300 penalty for harm to the environment. They claim the fine is improper since the court did not find that the defendants' actions caused actual harm to the environment. There is no requirement of proof of actual harm. As the trial court stated in its findings: "[I]f this violation was duplicated by the other sources the effects could cause serious harm." We find the court's decision to impose the $12,300 fine reasonable.

■ Finally, the defendants contest the court's allocation of $10,000 for Habib's indifference to the law. The record demonstrates Habib had been an employee with the Cleveland Division of Air Pollution Control for seventeen years before founding Thermal–Tron. He was familiar with the air contaminant emission laws and the necessity of obtaining a permit to operate. Habib, nonetheless, operated the incinerators for eleven months in violation of R.C. 3704.05. In light of these facts, we find the court's $10,000 penalty reasonable.

Accordingly, the fourth, fifth, and sixth assignments of error are overruled and the trial court's judgment is affirmed.

*Judgment affirmed.*

MATIA, C.J., and SPELLACY, J., concur.

APPENDIX

Appellants' assignments of error:

I

"The trial court erred in finding that any of Thermal–Tron's operations were in violation of the law, where the express terms of the modified permit to install permitted such operation for the purpose of bringing the facility into compliance, and the unrebutted evidence was that Thermal–Tron made contin-

uous progress towards achieving compliance with air pollution standards, not only reaching but far exceeding applicable emissions standards."

## II

"Assuming that any penalty was justified, the trial court erred by permitting EPA Official Thomas Rigo to offer his own opinion as to the amount of the penalty and the criteria and methods for calculating the penalty; and by admitting the U.S. EPA's 'Clean Air Act Stationary Source Civil Penalty Policy,' and associated work sheets. By doing so, the trial court permitted Rigo to usurp the court's responsibility to interpret the law, adopted legal standards without foundation in Ohio law, and most importantly, applied a policy that was adopted by the Ohio EPA only after the alleged violations occurred, in plain violation of the constitutional prohibition on retroactive legislation."

## III

"The crushing penalty imposed on this minority-owned business, which has been closed by the State and has no ability to pay the penalty, while competitors with more serious violations have paid minimal penalties and are permitted to continue operations, deprives defendants of the equal protection of the laws."

## IV

"The trial court applied an erroneous legal standard in basing the penalty on Thermal–Tron's net profits rather than the costs of delayed compliance."

## V

"The trial court erred by enhancing the penalty for harm to the environment, in the amount of $12,300, without requiring proof of any actual harm to the environment, and in the face of undisputed evidence that there was in fact no harm to the environment."

## VI

"The trial court's conclusion that defendants displayed indifference to the law, mandating a further enhancement of the penalty by $10,000 is against the manifest weight of the evidence."