DECISION
These are appeals by appellants, Women's Med Center of Akron, Women's Med Center of Cincinnati, Women's Med Center of Dayton, and Founder's Women's Health Center, from judgments of the Franklin County Court of Common Pleas affirming determinations by the director of the Ohio Department of Health that appellants are ambulatory surgical facilities subject to licensure requirements under R.C. 3702.30.
In proceedings before an administrative hearing examiner, the parties entered stipulations as to the primary facts of the case. Those stipulations, as well as facts set forth by the hearing examiner in two reports and recommendations, both dated April 5, 2000, provide the following factual background. In response to complaints received in 1999, surveyors from the Ohio Department of Health ("ODH") visited 22 facilities, including the facilities of the four appellants in the instant case. The director of ODH, through correspondence dated November 10, 1999, notified all the facilities surveyed that they were required to apply for licensure as an ambulatory surgical facility pursuant to R.C.3702.30. Each of the appellants in this case filed an appeal and a request for an administrative hearing on the issue of whether its facility was an ambulatory surgical facility under Ohio law.
A record hearing was held on February 7, 2000, in which the parties submitted agreed stipulations of fact. In the appeal involving appellants Women's Med Center of Akron, Women's Med Center of Cincinnati and Women's Med Center of Dayton (collectively "appellants WMC"), the parties' stipulations included the following agreed facts:
 1. Women's Medical Professional Corp., dba Women's Med Center of Dayton, is located in Dayton, Ohio. Women's Medical Professional Corp., dba Women's Med Center of Cincinnati is located in Cincinnati, Ohio. Women's Medical Professional Corp., dba Women's Med Center of Akron is located in Akron[,] Ohio. Together, they shall be referred to as "WMCs". Women's Medical Professional Corp. owns, op-erates and manages the WMCs.
 2. Dr. Martin Haskell, a medical doctor licensed to practice medicine in the state of Ohio since 1974, is the sole owner of the Corporation and each WMC.
 3. In response to a complaint that the 22 facilities, including the WMCs, were operating as unlicensed ambulatory surgical facilities ("ASF"), Ohio Department of Health ("ODH") surveyors visited all 22 facilities to determine if they met the definition of an ASF and HCF. * * *
 4. ODH issued determinations that the WMCs were ASFs and required licensure. The WMCs requested hearings on the determination that they are ASFs. * * *
* * *
 6. Abortions as performed at the Facility are "outpatient surgery". Abortions are routinely performed at the WMCs and the WMCs function separately from a hospital's inpatient surgical service and from the offices of podiatrists and dentists.
 7. "Offices of private physicians" as used in R.C. 3702.30 is not defined in Ohio statute or rule. Neither the Ohio [State] Legislature nor ODH intended for "offices of private physicians" to be required to be licensed.
 8. Approximately 90% of all medical care rendered at the Centers was for the performance of abortions. The remaining 10% of all medical care rendered at the Centers was for the performance of other womens [sic] reproductive medical care.
* * *
 11. Attachment 4 is a copy of an internal ODH memo dated May 1, 1996, concerning ODH's interpretation of a health care facility. It is the position of ODH that the primary purpose of the facility is the most significant, though not exclusive, factor in distinguishing an ASF from a physician's office. This internal memorandum was not rule filed.
 12. It is the position of the Center that the definition of a private physician's office is a site housing a medical practice owned by a physician licensed to practice medicine in Ohio.
The parties entered into an "addendum to stipulations," which stated in part as follows:
 1. Dr. Haskell operates each office and provides services to patients at each center. The five other physicians who also provide services to patients at these locations are under the direction and control of Dr. Haskell. * * * All billing is done by WMPC and payable to WMPC. The physicians are not permitted to bill separately for their services. All medical records are the personal property of Martin Haskell, M.D. Any physician who stops providing services to these patients is not permitted to compete with Dr. Haskell for services. Dr. Haskell retains all direct control over the physicians, staff, and the functioning of the medical practice, including hiring, training and supervision of physicians and support personnel, the acquisition of medical equipment, and design of the office.
 2. Patients are encouraged to return to the Centers for follow-up care, but may go to another physician for that service.
 3. For the period of September 1998-September 1999, 3546 abortions were performed at the Dayton Center, 3363 at the Cincinnati Center, and 949 at the Akron Center.
 4. Beginning May 1, 1996, ODH staff claim that they referred to the attached Memorandum dated May 1, 1996 when considering questions of HCF and ASF exemptions.
 5. On February 3, 2000, ODH announced at a meeting of a private group, the Ohio Ambulatory Surgery Centers Association, that the factors to be considered when deciding if there is a private physician office exclusion are to be taken together. No one factor will determine whether the exemption will apply.
 6. ODH did not follow the statutory rule-making requirements under ORC 119.03, when it drafted the internal May 1, 1996 Memorandum, the May 6, 1996 Memorandum, or the February 3, 2000 factors or release of any of these factors to the public.
 7. ODH seeks to enforce compliance with the regulations by responding to complaints and reviewing promotional materials. ODH is not canvassing or investigating all physician offices in Ohio for compliance with the regulations.
 8. Dr. Haskell routinely performs abortions at the Centers.
In the appeal involving appellant Founder's Women's Health Center (individually "appellant Founders"), the parties' stipulations included the following agreed facts:
 1. Harley Blank, M.D., Robert Chosy, M.D., and Karl Schaeffer, M.D. own and operate Downtown Gynecologists, Inc. d/b/a Founder's Women's Health Center. They routinely perform abortions services at Founder's.
2. No other physicians provide services at Founder's.
 3. Dr. Blank and Dr. Schaeffer also have an obstetrics and gynecological practice located on the property of a Catholic hospital. Dr[s]. Blank and Schaeffer perform surgeries at the practice located at the hospital site, including D C, biopsy, endometrial biopsies, skin biopsies, LEEP conization of the cervix, and hysteroscopies. Due to their contract with the Catholic hospital, abortions are not allowed to be performed on the premises. Dr. Blank's prior second practice was not at a Catholic Hospital and he performed abortions [sic] services there.
 4. In response to a complaint that the 22 facilities, including Founder's, were operating as unlicensed ambulatory surgical facilities ("ASF"), Ohio Department of Health ("ODH") surveyors visited all 22 facilities to determine if they met the definition of an ASF and a Health Care Facility (HCF). * * *
 5. ODH issued a determination that Founder's is an ASFs and required licensure. Founder's requested hearings on the determinations that they are ASFs. * * *
* * *
 7. Abortions as performed at the Facility are "outpatient surgery". Abortions are routinely performed at Founder's and Founder's functions separately from a hospital's inpatient surgical service and from the offices of podiatrists and dentists.
 8. "Offices of private physicians" as used in R.C. 3702.30 is not defined in Ohio statute or rule. Neither the Ohio State Legislature nor ODH intended for "offices of private physicians" to be required to be licensed.
 9. For the period of September 1998-September 1999, 2128 abortions were performed at Founder's.
 10. Attachment 3 is a copy of advertisements for the Centers found in the appropriate Yellow Pages.
 11. Attachment 4 is a copy of an internal ODH memo dated May 1, 1996, concerning ODH's interpretation of a health care facility. It is the position of ODH that the primary purpose of the facility is the most significant, though not the exclusive, factor in distinguishing an ASF from a physician's office. This internal memorandum was not rule filed.
 12. It is the position of the Center that the definition of a private physician's office is a site housing a medical practice owned by a physician licensed to practice medicine in Ohio.
* * *
 15. Nursing home operators, not owners, are licensed by ODH.
 16. Adult Care Facilities, not owners, are licensed by ODH.
The parties also entered into an "addendum to stipulations," which stated in pertinent part:
 1. At Founder's, the physicians and staff provide abortion services, including chlamydia cultures, D Cs, Depo Provera Injections, diaphragm fittings, emergency contraceptive visits, IUD removal, and ultrasounds. Founder's performed 3,274 service units in 1999, of those, 1990, or 60% were abortion procedures.
 2. Dr. Blank has first hand knowledge of the practice of a periodontal surgeon. This surgeon performs in his private office, periodontal surgery, gum surgery, implants, reconstructive mouth surgery, cosmetic surgery. These surgeries are done in his private office. They constitute at least fifty percent of his practice. [Report and Recommendation of Hearing Officer, at 5-7.]
The hearing examiner issued reports and recommendations finding that each of the appellants' facilities met the definition of an ambulatory surgical facility pursuant to R.C. 3702.30(A)(1)(a), (b) or (f), as well as a health care facility pursuant to R.C. 3702.30(A)(4), therefore requiring licensing under Ohio law. On May 8, 2000, the director of ODH issued journal entries accepting the recommendations of the hearing examiner that each of the facilities were required to be licensed by the state as a health care facility pursuant to R.C. 3702.30(D).
Appellants WMC and Founders filed notices of appeals with the trial court from the director's decisions and orders. On July 19, 2001, the trial court issued decisions affirming the orders of ODH. Appellants WMC and Founders timely appealed the decisions of the trial court, and by entry of this court the appeals were consolidated.
On appeal, appellants set forth the following two assignments of error for review:
FIRST ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN AFFIRMING OHD'S DECISION THAT APPELLANTS ARE SUBJECT TO LICENSING AND NOT SHIELDED AS OFFICES OF PRIVATE PHYSICIANS[.]
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT ERRED AS A MATTER OF LAW IN AFFIRMING ODH'S DECISION THAT APPELLANTS ARE HOLDING THEMSELVES OUT AS ASFS BECAUSE ODH'S DECISION IS CONTRARY TO LAW AND NOT SUPPORTED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVI-DENCE AND THEREFORE SHOULD BE REVERSED[.]
Appellants' assignments of error are interrelated and will be addressed together. In these appeals, appellants WMC and Founders challenge ODH's inter-pretation, as well as the constitutionality, of R.C. 3702.30.
In Donia v. Ohio Dept. of Health (May 7, 2001), Guernsey App. No. 00CA26, the court noted the applicable standards of review in an administrative appeal under R.C. 119.12:
 * * * The standard of review which the trial court must employ in an appeal from an administrative agency is governed by R.C. 119.12, which states, in pertinent part: The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law.
 The evidence required by R.C. 119.12 has been defined as follows: (1) "reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability the evidence is true; (2) "probative" evidence is evidence which tends to prove the issue in question; it must be relevant in determining the issue; and (3) "substantial" evidence is evidence with some weight; it must have importance and value. Our Place, Inc. v. Ohio Liquor Control Comm'n (1992), 63 Ohio St.3d 570, 571. "The appellate court's review is even more limited than that of the trial court. While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court." Pons v. Ohio State Medical Bd. (1993), 66 Ohio St.3d 619, 621. On an appeal pursuant to R.C. 119.12, an appellate court shall review evidentiary issues to determine whether the common pleas court abused its discretion in determining whether or not the agency decision was supported by reliable, probative and substantial evidence. Id. "Abuse of discretion connotes more than an error of law or of judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable." Tracy v. Merrell Dow Pharmaceuticals, Inc. (1991), 58 Ohio St.3d 147, 152. * * *
R.C. 3702.30, which provides for the licensing of "ambulatory surgical facility" as health care facilities, states in pertinent part:
As used in this section:
 (1) "Ambulatory surgical facility" means a facility, whether or not part of the same organization as a hospital, that is located in a building distinct from another in which inpatient care is provided, and to which any of the following apply:
 (a) Outpatient surgery is routinely performed in the facility and the facility functions separately from a hospital's inpatient surgical service and from the offices of private physicians, podiatrists, and dentists;
 (b) Anesthesia is administered in the facility by an anesthesiologist or certified registered nurse anesthetist and the facility functions separately from a hospital's inpatient surgical service and from the offices of private physicians, podiatrists, and dentists;
* * *
 (f) The facility is held out to any person or government entity as an ambulatory surgical facility or similar facility by means of signage, advertising, or other promotional efforts. * * *
Appellants assert that the trial court and ODH erred in interpreting this statute, and appellants argue they are exempt from the licensing requirements for ambulatory surgical facilities because they fall under the statutory exemption of R.C. 3702.30(A)(1)(a) as "offices of private physicians." Appellants maintain that the phrase "offices of private physicians" must be given its plain and ordinary meaning, and they contend the plain definition of the phrase means that an office of a private physician exists where a licensed surgeon owns his own business and practices surgery. Appellants argue that ownership of the practice is the only factor that should be used in determining the plain meaning of a private physician's office.
Appellants also argue that ODH employed different sets of criteria in defining whether or not a particular facility is an ambulatory surgical facility (hereafter "ASF") or the office of a private physician. As indicated by the stipulations, in May 1996, ODH staff referred to a memorandum, dated May 1, 1996, when considering health care facility and ASF exemptions. Those guidelines included a consideration of whether patients are referred to a facility for a specific test and, in the case of group practices, a consideration of the manner in which the practice is set up and advertised, and whether or not tests are performed by someone other than the attending physician.
In a document dated February 3, 2000, ODH listed the following factors as relevant in determining whether or not a particular entity should be characterized as an ASF: whether the physician is a sole practitioner performing procedures on his or her own patients; whether there are multiple physicians performing the same procedures on his/her own patients; the relationship of physician to ownership of the entity; the physician's primary scope of practice; the frequency/volume of the surgeries; and, whether the physician received referrals from other physicians to perform the surgeries. Other factors listed involved the manner in which the entity holds itself out to the public (i.e., advertising, signage), whether the entity is certified via HCFA, whether the entity is accredited, and whether the facility is fee billed.
We note that, although appellants assert that ODH employed various criteria in determining that the entities at issue constituted ASFs, the hearing examiner did not rely upon those factors in finding that appellants met the statutory definition of ASFs. Specifically, while the hearing examiner recognized that ODH had proposed a number of factors to be employed in defining "offices of private physicians," and that ODH presented in support an internal memorandum, the hearing examiner ultimately concluded that "[t]his internal memorandum is not a rule of the Ohio Administrative Code and can provide no legal authority in this case as to how the phrase `offices of private physicians' is to be interpreted." Thus, in finding that the appellants in the instant case were subject to licensure under R.C. 3702.30, the hearing examiner relied upon a consideration of the statutory language rather than the factors challenged by appellants.
Apart from the specific factors cited above, the stipulations entered in this case indicate that it is ODH's position that "the primary purpose of the facility is the most significant, though not the exclusive, factor in distinguishing an ASF from a physician's office." In general, "[a] court must give due deference to an agency's reasonable interpretation of the legislative scheme." Northwestern Ohio Bldg. Constr. Trades Council v. Conrad (2001), 92 Ohio St.3d 282, 287. See, also, Donia, supra, ("a trial court must accord due deference to an administrative agency's interpretation of relevant statutes and provisions of the Ohio Administrative Code"). It has been held that in instances in which a statute is silent or ambiguous with respect to a specific issue, "`the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" Northwestern Ohio Bldg., supra, at 288, quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. (1984), 467 U.S. 837, 843, 104 S.Ct. 2778, 2782. Further, "no set of statutes and administrative rules will answer each and every administrative concern." Northwestern Ohio Bldg., supra, at 289. Here, we consider whether the trial court erred in finding ODH's interpretation of "offices of private physicians" to be reasonable, and we need not give due deference to the agency's interpretation if it is inconsistent with the statutory purpose.
The phrase "offices of private physicians" is not defined in the statute. As noted above, appellants contend that ownership is the sole relevant factor in determining the meaning of a private physician's office. In addressing this issue, the trial court rejected appellants' interpretation, finding that appellants' focus on ownership "defeats the purpose of the statute." More specifically, the trial court held that the intent of the statute is to "regulate the ambulatory surgery centers to provide safe out-patient surgery for the public," and the court further held that "[i]t is the nature of the procedures performed which must be evaluated in order to determine whether these clinics are health care facilities and specifically ambulatory surgery centers."
Upon review, we agree with the trial court's determination that ownership is not the determinative factor as to whether appellants' facilities qualify for the statutory exemption as offices of private physicians. The statute itself does not address the issue of actual ownership of a particular office by a physician. Presumably, had ownership been the determining factor the legislature could have specifically provided an exemption for an ASF "owned and operated" by a physician. As noted by ODH, a physician owned hospital or nursing home would not cease to be a hospital or nursing home simply because it is owned by a physician; nor do we believe that the legislature intended that a physician could purchase or construct what would otherwise be an ASF and lease it out to an entity for operation as such a facility while claiming an exemption simply because it was owned by a physician.
Pursuant to R.C. 3702.30(A)(4)(a), a "[h]ealth care facility" is defined to include "[a]n ambulatory surgical facility." Under R.C.3702.30(A)(1)(a), an "ambulatory surgical facility" includes a facility in which outpatient surgery is routinely performed. The intent of the statute appears to be directed toward a particular type of facility or, more specifically, the use of that facility, and the provision that outpatient surgical procedures be "routinely" performed at the facility suggests that the legislature was concerned with safeguards for facilities regularly devoted to performing outpatient elective surgery. Thus, because the focus of the statute involves use of the facility, as opposed to a legal ownership interest in a building, we find unpersuasive appellants' contention that ownership is the only factor to be used in determining the plain meaning of a private physician's office.
While it appears that no Ohio cases have attempted to give specific meaning to the phrase "offices of private physicians," in In The Matter of: North Shore Radiology, Inc., (Sept. 1, 1994), Franklin App. No. 94APH02-169, this court discussed, albeit in dicta, the language of R.C.3702.51(G) that "a health care facility does not include the offices of private physicians and dentists whether for individual or group practice." In North Shore, a case involving the issue of whether a facility was a free standing diagnostic imaging center for purposes of certificate of need review law, this court considered the above language in conjunction with the provision of former R.C. 3702.51 defining the term "health care facility" to mean "a free standing or mobile diagnostic imaging center." Id. While it was noted that there is no statute or rule definition explaining what is meant by the sentence that a health care facility does not include the offices of private physicians, this court indicated that the appropriate method may be "to determine the primary use of the facility." Id. Thus, this court noted that if the diagnostic imaging center is only incidental to the offices of private physicians, the facility is not a health care facility requiring a certificate of need; however, if the offices of private physicians are merely incidental to the operation of the diagnostic imaging center, then the diagnostic imaging center is a free-standing center and thus a reviewable health care facility.
In the present case, the hearing examiner considered the actual use of the facilities in considering whether they constituted offices of private physicians. The hearing examiner, in construing the phrase "offices of private physicians," noted an expectation that a "private office" would be commonly considered to be an office used "primarily, perhaps even exclusively" by a physician for care and treatment of the physician's own patients. We find this definition to be reasonable, and we would further conclude that, similar to the analysis of North Shore, supra, where the evidence indicates that the primary purpose of a facility is to provide outpatient, ambulatory surgical services, for which the office of a physician is merely incidental, such facility would not qualify under the statutory exemption as offices of private physicians.
In the case of appellants WMC, the evidence indicates that outpatient surgery is routinely performed at each of the facilities. The parties stipulated that abortions, as performed at the facilities, constitute "outpatient surgery," and it was further stipulated that approximately "90%" of all medical care at the facilities was for the performance of abortions. The evidence indicates that, during a one-year time period, 3,546 abortions were performed at the Dayton facility, 3,363 at the Cincinnati facility, and 949 at the Akron facility. Further, while Dr. Haskell owns the corporation that operates the three facilities, five other physicians perform surgery at the facilities. These physicians are not part of a group practice in partnership with Dr. Haskell, but, instead, they are independent contractors, compensated on a per-abortion procedure basis, and not permitted to bill separately for their services at the facilities. The hearing examiner also noted that the evidence submitted indicated that the surgery performed at the facilities occurs in "rooms equipped specifically for abortion procedures and for medical emergencies that can arise in performing such procedures."
In considering the manner in which the practice was operated, including the fact that "90%" of the medical care is devoted to elective outpatient surgery, and that the subject facilities employ physicians as independent contractors to perform surgery for which compensation is made on a per-abortion procedure basis, the hearing examiner concluded that the evidence failed to show these physicians performed surgery in either Dr. Haskell's private physician's office or in their own private physician's office. We agree, and find that the evidence indicates not only that ambulatory surgical procedures are routinely performed at the facilities, but that the facilities at issue are devoted primarily to the performance of outpatient ambulatory surgery as opposed to the diagnosis and treatment of a physician's own patients. Accordingly, we conclude that the trial court did not err in affirming ODH's determination that appellants' facilities did not qualify for exemption from licensure requirements as offices of private physicians under R.C. 3702.30(A)(1)(a).
We also conclude that the trial court did not err in affirming ODH's decision adopting the hearing examiner's finding that appellants WMC advertise, pursuant to R.C. 3702.30(A)(1)(f), as a facility that holds itself out "as an ambulatory surgical facility or other similar facility by means of signage, advertising, or other promotional efforts." Appellants WMC advertise in the Yellow Pages in the Akron/Medina area, as well as the Dayton area, as "Abortion Care Specialists." In Cincinnati, appellants WMC advertise in the Yellow Pages as providing "Abortions Through 24 Wks," and the advertisement is under the heading of "Clinics." We note that the definition of "clinic" includes an "institution, building, or part of a building where ambulatory patients are cared for." Stedman's Medical Dictionary (1961) 327. See, also, Webster's Third New Int'l Dictionary (3 Ed. 1966) 423 (defining "clinic" as an institution where diagnosis and treatment are made available to outpatients). The critical issue, for purposes of R.C. 3702.30(A)(1)(f), is whether the entity holds itself out as an ASF or similar facility by the types of services it advertises or promotes. As noted, the parties stipulated that abortion as performed at the facilities is an outpatient surgical procedure. Here, where appellants WMC advertise as providing outpatient ambulatory surgical services in the form of abortions, the evidence supports ODH's determination that appellants WMC hold themselves out as "an ambulatory surgical facility."
We next consider the issue of whether the trial court erred in determining that appellant Founders was subject to licensure as an ASF. The hearing examiner noted in his decision that there was no dispute that Founders is located in a building distinct from another building in which inpatient care is provided, and it was also not disputed that outpatient surgery is routinely performed at Founders. Regarding the issue of whether Founders is exempt as offices of private physicians, the hearing examiner noted that the facility consists of two large procedure rooms, two small examination rooms, a recovery area, a bathroom and two waiting rooms utilized to provide abortion services among the three physicians working at the facility. The hearing examiner also noted that two of the physicians who perform procedures at Founders maintain separate offices at a local hospital where they offer "a broad range of ob/gyn services, surgical and non-surgical." These physicians perform abortions only at Founders, as the evidence indicated that abortions are not permitted at the offices they maintain at the hospital.
In its objections to the hearing examiner's report, appellant Founders asserted that it was exempt as "offices of private physicians" based upon the fact that three physicians are the sole shareholders of the corporation owning the facility. In adopting the recommendation of the hearing examiner, the director of ODH considered the physical layout of the facility, the percentage of surgical procedures performed, as well as the fact that two of the physicians maintain medical practices at a separate location for a variety of obstetric/gynecologic services.
Upon review, we find that the trial court did not err in finding that the evidence supported the hearing examiner's conclusion that the outpatient surgery routinely performed at Founders occurs in a facility that functions separately from the offices of private physicians. The stipulated evidence indicates that ambulatory surgery in the form of abortions accounts for "60%" of the services provided at appellant Founders' facility, and the description of the facility suggests that it was specifically set up for such procedures. Further, while two of the physicians had other offices at a hospital where they performed a variety of obstetric/gynecologic services, these physicians did not perform abortions at those offices, but, instead, utilized the facility at issue for that purpose. Similar to the evidence regarding appellants WMC, the evidence indicates not only that outpatient ambulatory surgery is routinely performed at Founders, but that the facility is primarily devoted to these services. Further, to the extent that the facility includes the office of a physician, the evidence indicates that such office is merely incidental to the primary purpose of providing outpatient ambulatory surgical services.
We also find that the record supports a determination that appellant Founders holds itself out as an ambulatory surgical facility by means of signage, advertising or other promotion efforts pursuant to R.C.3702.30(A)(1)(f). Appellant Founders does not advertise under the names of any of the practitioners but, rather, under "abortion services." The Yellow Page ad contains a bolded heading indicating "Abortion Through 16 Weeks." The director of ODH, as well as the trial court, concluded that appellant Founders, through advertisement, specifically offers outpatient ambulatory surgical services in the form of abortion services for pregnancies through 16 weeks, and therefore adopted the recommendation of the hearing examiner that appellant Founders qualifies as an ASF under R.C. 3702.30(A)(1)(f). Upon review, we find that the trial court did not err in finding that appellant Founders holds itself out in advertisements as a facility specializing in ambulatory surgical procedures.
In addition to challenging ODH's and the trial court's interpretation of R.C. 3702.30, appellants also raise constitutional challenges to the statute. Appellants first contend that ODH has engaged in selective enforcement of the statute in violation of the constitutional right to equal protection. Specifically, appellants assert in their appellate brief that ODH is proceeding only against physicians providing abortion services.
In Cleveland v. Trzebuckowski (1999), 85 Ohio St.3d 524, 531, the Ohio Supreme Court held:
 "`To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'" * * *
In State ex rel. Celebrezze v. Thermal-Tron, Inc. (1992),71 Ohio App.3d 11, 18-19, the court held:
 "[T]he conscious exercise of some selectivity in enforcing a statute fair on its face does not in and of itself amount to a constitutional violation." * * * For selective enforcement to constitute a denial of equal protection, the defendants must demonstrate purposeful or intentional discrimination. * * * This burden is not satisfied by "a mere showing that another person similarly situated was not prosecuted * * *; a defendant must demonstrate actual discrimination due to invidious motives or bad faith. Intentional or purposeful discrimination will not be presumed from a showing of differing treatment." * * * Finally, a defendant prosecuted under a regulatory statute is not relieved of this burden. * * *
In the present case, the trial court rejected appellants' claim of selective enforcement, noting that one of the exhibits in evidence contained a 17-page list of providers whom ODH has either licensed or is in the process of licensing. The trial court cited the fact that the list included "dentists, cosmetic surgeons, eye surgeons, etc."
Without reference to evidence in the record, appellants assert in their appellate brief: "ODH is proceeding only against physicians providing abortion services in their offices." (Brief of Appellants, at 33.) However, there was no evidence that the agency deliberately chose not to survey other facilities, nor have appellants presented evidence that ODH's decision to survey the facilities at issue was motivated by a discriminatory purpose. As noted by the trial court, one of the exhibits attached as part of the stipulations sets forth a list of facilities in the state either licensed as ASFs or that have an application for licensure pending, including numerous facilities where physicians provide services other than abortions. Further, we agree with the trial court's finding that there was no evidence that ODH was exclusively targeting abortion clinics merely because a right-to-life group may have made ODH aware that a particular facility was not licensed. Accordingly, we find that the trial court properly concluded there was insufficient evidence to support a claim that ODH deprived appellants of their equal protection rights.
Appellants also contend that the trial court erred in failing to find that ODH's definition of "offices of private physicians" is unconstitutionally vague because it fails to give a physician fair warning and is subject to arbitrary enforcement.
In addressing this argument, the trial court held that there is nothing ambiguous about "offices of private physicians." The court agreed with the hearing examiner's definition of a private physician's office as a place where a physician treats his or her private patients. The trial court further noted that the facilities at issue are set up to perform a specific surgical procedure, and that "the patients for the most part are not regular patients and are not known to the physicians." The court deemed the facilities at issue to be in a similar category as hospitals, with the exception that surgery at appellants' facilities is performed on an outpatient basis.
In its decision, the trial court cited Leon v. Ohio State Bd. of Psychology (1992), 63 Ohio St.3d 683, for the proposition that terms used in a statute are to be given their usual and ordinary meaning, and that each case must be evaluated on its own facts. In Leon, the appellant challenged a statute prohibiting a psychologist from engaging in sexual relations with "clients or immediate ex-clients." Id. at 686. Appellant contended that the term "immediate ex-client" was not defined by regulation, and that he should not be deprived of his livelihood based on a regulation that is unconstitutionally vague and subject to differing interpretations.
In Leon, supra, the court rejected appellant's contention, holding in part:
 In our view, the term "immediate ex-client" is not uncon-stitutionally vague either facially or as applied to the particular facts of this case. Simply because the term "immediate ex-client" was not temporarily defined within the regulation does not make it unconstitutionally vague. * * * As pointed out by the board, application of the term on a case-by-case basis is appropriate. * * *
It has been held that "[t]he test in determining whether or not a statute is unconstitutionally vague is whether men of common intelligence must necessarily guess at its meaning." Lang v. Berger (S.D.N.Y. 1977),427 F. Supp. 204, 211. Thus, in the context of a statute affecting a member of the medical profession, the court must consider whether members of such profession "must necessarily guess at the meaning of phrases set forth in the statute." Id.
In the present case, we do not find that the statutory language at issue is void for vagueness. The statute sets forth the meaning of "ambulatory surgical facility" to include a facility "located in a building distinct from another in which inpatient care is provided," and in which outpatient surgery "is routinely performed in the facility." Further, although "offices of private physicians" is not defined, we do not believe that members of the medical profession need guess at its meaning. We have previously found the meaning ascribed by the hearing examiner (i.e., an office used primarily by a physician for the care and treatment of the physician's own patients) to be reasonable, and we believe that members of the medical profession would be able to distinguish between that type of setting and a facility for which the primary purpose is to provide outpatient ambulatory surgical services. Further, the fact that ODH may be required to conduct a case-by-case analysis as to whether a particular entity qualifies under the exemption for "offices of private physicians" does not, in and of itself, render the statute void for vagueness. Leon, supra.
Finally, appellants contend that ODH's interpretation of "offices of private physicians" places an undue burden on a woman's right to have an abortion. Appellants assert in their appellate brief that they have raised "sufficient facts" that point to a potential infringement of the right of women to receive abortion services.
In response, ODH argues there is no evidence in the record that appellants could not meet licensure requirements, or that meeting the requirements would create such an increase in the cost of abortions as to limit the availability of abortions. ODH also argues that there is no evidence that meeting licensure would cause the closure of these four facilities, nor is there evidence that satisfying licensed requirements of these four facilities would present a substantial obstacle to women seeking abortions inasmuch as abortions remain available in licensed facilities, hospitals and doctor's offices.
At the outset, we note that appellants assert their claim without any citation to the record, and we agree with ODH's contention that the stipulations and other evidence do not support appellants' claim as to "sufficient facts" regarding this issue. Here, the statute at issue is "abortion neutral" in that the legislature has chosen to regulate all ambulatory surgical facilities, not just facilities that provide surgery in the form of abortions. Baird v. Dept. of Public Health (C.A.1, 1979), 599 F.2d 1098, 1102 (the fact that provisions of licensure law for ambulatory health care centers "apply generally to health care facilities of all kinds, and do not single out abortions, suggests that they reflect a neutral evaluation and selection of standards deemed necessary to safeguard the public"). Here, there is no indication that the focus of the legislation was upon abortion providers; rather, as previously discussed, the statute appears to be directed at assuring standards of health and safety at all facilities that routinely perform outpatient surgical procedures.
We also note that other courts have upheld statutes licensing "freestanding surgical outpatient facilities" on the grounds that the statutes do not specifically burden a woman's right to have an abortion. Abortion Coalition of Michigan v. Michigan Dept. of Public Health (E.D.Mich. 1977), 426 F. Supp. 471 (since states may regulate the practice of licensed physicians in matters generally related to patient health, statute regulating freestanding surgical outpatient facilities cannot be considered facially unconstitutional as applied to first trimester abortion facilities simply because it narrows the physician's choice in deciding where an abortion is to be performed). See, also, Hodgson, M.D. v. Lawson (C.A.8, 1976), 542 F.2d 1350, 1358 ("state can impose the same regulations on a clinic, specifically built to perform abortions during the first trimester, that are imposed on other clinics that perform surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions"). Accordingly, in light of the record before this court, we find no merit to appellants' claim that ODH's interpretation of the statute places an undue burden on a woman's right to have an abortion.
Based upon the foregoing, we conclude that the trial court did not err in affirming the decisions of the director of ODH that appellants are ambulatory surgical facilities subject to licensure as health care facilities under R.C. 3702.30. Accordingly, appellants' first and second assignments of error are overruled and the judgments of the trial court are hereby affirmed.
Judgments affirmed.
McCORMAC, J., concurs.
TYACK, P.J., dissents.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.