JOURNAL ENTRY and OPINION.
{¶ 1} Defendants-appellants City of Cleveland, Cleveland Police, Fire, Health, and Community Development Departments, and Robert Vilkas (collectively referred to as "Cleveland"), appeal the trial court's denial of their motion for summary judgment, grant of plaintiff-appellee PDU, Inc.'s ("PDU") motion for temporary restraining order, and the jury verdict against them. Finding some merit to the appeal, the trial court's judgment is affirmed in part and reversed in part.
 {¶ 2} In the summer of 2000, five people drowned in the Cuyahoga River in "the Flats" area of Cleveland. In response to these tragic deaths, then-Mayor Michael White created the Flats Safety Task Force ("task force") to address health and safety concerns in the Flats. The mayor selected members of the task force from Cleveland's fire, police, building and housing departments. The task force's primary objective was "to identify and take aggressive enforcement action to abate the public nuisance created by selected liquor permitted establishments." The task force also sought stricter enforcement of Cleveland ordinances. To accomplish these goals, the task force selected for inspection certain establishments it thought presented either code enforcement violations or other law enforcement issues.
 {¶ 3} Defendant-appellant Robert Vilkas ("Vilkas"), the Commissioner of the Division of Building and Housing, was chairman of the structures committee of the task force. The structures committee was responsible for drafting legislation for safety devices and for placement of pedestrian barriers along the river's edge. Vilkas was not involved in selecting which establishments would be inspected. Rather, he inspected the establishments, determined if there were any code violations, and decided what course of action was appropriate.
 {¶ 4} PDU, dba Heaven Earth, owned and operated a nightclub ("the club") located on the east bank of the Flats. In 1997, PDU opened the upstairs portion of the building under the name "Heaven," and in 2000, it opened the downstairs portion and called it "Earth." In May 1997, Cleveland and Vilkas issued a general building permit to PDU for the renovation of the upstairs. Cleveland also issued two temporary certificates of occupancy in October 2000 and February 14, 2001 when PDU renovated the downstairs portion of the building. The certificate issued in February had an expiration date of March 14, 2001. During this time, PDU had a good relationship with Cleveland fire and building inspectors and maintained contact with them because they inspected PDU's premises at least once a year.
 {¶ 5} Prior to March 2001, the club was a successful business, which Cleveland had not cited for any violations relating to assaults, robberies, drunken behavior of patrons, or drug abuse, nor were the police called to break up any fights. A local newspaper named the club the "best new nightclub" in 2000.
 {¶ 6} In February 2001, PDU negotiated a sale of the club to Dazner, Inc. ("Dazner") for $400,000, and planned on finalizing the purchase on March 5, 2001. However, on Friday, March 2, 2001, at approximately 11:00 p.m., without any prior notice, the task force, including Cleveland police, fire and building inspectors, and Vilkas came to the club to inspect the premises. They checked the identification of all patrons as they ordered them out of the club and found no underage violations. This unannounced inspection occurred during the club's busiest time of the week.
 {¶ 7} Vilkas decided to immediately shut down the club. Cleveland had carpenters waiting in a truck parked nearby, prepared to immediately board up the club.
 {¶ 8} PDU was unable to operate the club for three weekend nights. On March 18, 2001, PDU filed a complaint and motion for restraining order against Cleveland, the police, fire and health departments, and Vilkas. The court subsequently granted a temporary restraining order allowing the club to reopen and prohibiting Cleveland from entering the building.
 {¶ 9} As a result of the surprise inspection and temporary shutdown, the club suffered a drastic decrease in business because many of its regular customers thought it was closed. On March 4, 2001, a representative of Dazner advised PDU that it was no longer interested in purchasing the club in light of the recent raid.
 {¶ 10} Due to the slump in business, PDU was unable to pay its bills and could not afford to pay contractors for the work required to bring the building up to code. Eventually, PDU sold the club to Dazner for the reduced price of $129,000 in May 2001.
 {¶ 11} In its complaint,[1] PDU alleged Cleveland unlawfully deprived it of its rights to freedom and property in violation of theFirst Amendment and due process clauses of the Fifth andFourteenth Amendments to the U.S. Constitution. PDU also alleged Cleveland violated its constitutional rights to equal protection, free speech, and due process guaranteed under the Ohio Constitution. PDU's federal claims were brought pursuant to 42 U.S.C. § 1983.
 {¶ 12} The case was removed to federal court where PDU and the other plaintiffs were permitted to withdraw their federal claims, thereby foreclosing jurisdiction. Accordingly, the case was remanded to the common pleas court.
 {¶ 13} Cleveland and Vilkas moved for summary judgment arguing they were immune from liability under the doctrine of governmental immunity provided by R.C. Chapter 2744. They also argued that PDU's other claims failed as a matter of law because there is no private cause of action for violation of the free speech and equal protection provisions of the Ohio Constitution and PDU failed to produce evidence of discrimination and inadequate state remedies.
 {¶ 14} The trial court denied the motion for summary judgment and the case proceeded to a jury trial. The jury awarded PDU damages in the amount of $345,000.
 {¶ 15} Cleveland raises five assignments of error on appeal.
 Summary Judgment {¶ 16} In its first assignment of error, Cleveland argues the trial court erred in failing to grant its motion for summary judgment because there is no private cause of action for PDU's claims under the Ohio Constitution. We agree.
 {¶ 17} After deletion of the federal claims, the remaining three counts in the amended complaint alleged violations of rights guaranteed under the Ohio Constitution, specifically, rights to equal protection, free speech, and due process under Article I, Sections 2, 11, and 16 of the Ohio Constitution.
 {¶ 18} In Provens v. Stark County Bd. of Mental Retardation Developmental Disabilities (1992), 64 Ohio St.3d 252, 254, the Ohio Supreme Court held that the right to freedom of speech conferred under Article 1, Section 11 of the Ohio Constitution is not self-executing and does not create a private cause of action. See, also, Chalker v. Howland
(1995), 74 Ohio Misc.2d 5, 22.
 {¶ 19} In Provens, plaintiff Provens claimed the Stark County Board of Mental Retardation and Developmental Disabilities violated her rights under the Ohio Constitution by harassing her and discriminating against her because she criticized the Board's practices and filed discrimination charges against the Board with the Ohio Civil Rights Commission and the Equal Opportunity Commission. Provens, supra, at 252-253. Provens apparently did not specify in her complaint which constitutional rights were violated. However, in her brief, Provens relied upon Sections 1, 2, 3, 14, and 16 of Article I of the Ohio Constitution. Id. at 252. Although Provens did not specify which particular rights were violated, the Supreme Court concluded that the thrust of her allegations indicated that her right to freedom of speech guaranteed under Article I, Section 11 was violated. Id. at 254. In holding that Provens did not have a private cause of action for an alleged violation of Article I, Section 11, the Ohio Supreme Court stated:
"This constitutional provision does not set forth an accompanying causeof action for a violation of the right of free speech. And,parenthetically, no other constitutional provision relied upon by theappellant provides an individual cause of action of an alleged violationof such constitutional right. Additionally, the Ohio General Assemblyhas not authorized such an action."
 {¶ 20} Further, in State v. Williams (2000), 88 Ohio St.3d 513, the Ohio Supreme Court explained:
"A constitutional provision is self-executing when it is complete initself and becomes operative without the aid of supplemental or enablinglegislation. In re Protest Filed by Citizens for the Merit Selection ofJudges, Inc. (1990), 49 Ohio St.3d 102, 104, 551 N.E.2d 150, 152.Likewise, a constitutional provision is not self-executing if itslanguage, duly construed, cannot provide for adequate and meaningfulenforcement of its terms without other legislative enactment. State exrel. Russell v. Bliss (1951), 156 Ohio St. 147, 151-152, 46 Ohio Op. 3,5, 101 N.E.2d 289, 291. Stated more succinctly, the words of aconstitutional provision must be sufficiently precise in order to provideclear guidance to courts with respect to their application if theprovision is to be deemed self-executing."
 {¶ 21} The language of Article I, Sections 2, 11, and 16 is not sufficiently precise to provide clear guidance to the courts with respect to enforcement of its terms or application of its provisions. For example, Article I, Section 2 provides:
"All political power is inherent in the people. Government isinstituted for their equal protection and benefit, and they have theright to alter, reform, or abolish the same, whenever they may deem itnecessary; and no special privileges of immunities shall ever begranted, that may not be altered, revoked, or repealed by the GeneralAssembly."
 {¶ 22} Similarly, Article I, Section 11 provides:
"Every citizen may freely speak, write, and publish his sentiments onall subjects, being responsible for the abuse of the right; and no lawshall be passed to retrain or abridge the liberty of speech, or of thepress. In all criminal prosecutions for libel, the truth may be given inevidence to the jury, and if it shall appear to the jury, that the mattercharged as libelous is true, and was published with good motives, and forjustifiable ends, the party shall be acquitted."
 {¶ 23} Finally, Article I, Section 16 provides:
"All courts shall be open, and every person for an injury done him inhis land, goods, person, or reputation, shall have remedy by due courseof law, and shall have justice administered without denial or delay.Suits may be brought against the state, in such courts and in suchmanner, as may be provided by law."
 {¶ 24} The language in these sections of the Ohio Constitution is not an independent source of self-executing protections. These sections are statements of fundamental ideals upon which our government is based. Still, they require supplemental or enabling legislation to give these ideals practical effect because they "lack the completeness required to offer meaningful guidance for judicial enforcement." Williams, supra.
 {¶ 25} PDU cites several cases which it claims support its position that Article I, Sections 2, 11, and 16 create independent causes of action. However, without exception, all of the cases cited by PDU are criminal cases in which the defendants raised a claim of discriminatory enforcement or discriminatory prosecution as a defense to criminal prosecution. For example, in State ex. rel. Celebrezze v. Thermal-Tron,Inc. (1992), 71 Ohio App.3d 11, the defendants raised selective enforcement as a defense to the Ohio Attorney's action against them for violating the Ohio Environmental Protection Agency's air contaminant emissions standards.
 {¶ 26} Similarly, in City of Cleveland v. Tzebuckowski (1999),85 Ohio St.3d 524, the defendant raised selective prosecution as a defense to criminal prosecution for violating an ordinance which prohibited a minor in a billiard room. In that case, the court dismissed the charges because the selective prosecution violated the defendant's right to equal protection. Although these cases recognize discriminatory prosecution and selective enforcement as valid defenses, none of the cases cited by PDU recognize them as independent causes of action.
 {¶ 27} Thus, because Sections 2, 11, and 16 of Article I of the Ohio Constitution are not self-executing provisions, they do not create independent causes of action. Moreover, unlike the federal system where42 U.S.C. § 1983 creates a private cause of action to remedy violations of the United States Constitution, there exists no statute in Ohio analogous to Section 1983. Therefore, PDU's complaint fails to state a claim upon which relief may be granted, and the trial court erred in denying Cleveland's motion for summary judgment. Accordingly, the first assignment of error is sustained.
 {¶ 28} Having determined that PDU's complaint fails to state a cause of action, the second, third, and fourth assignments of error dealing with the alleged errors at trial are moot.
 Motion for Temporary Restraining Order {¶ 29} In its fifth assignment of error, Cleveland argues the trial court abused its discretion in granting PDU's ex parte motion for temporary restraining order by failing to comply with the requirements of Civ.R. 65. Specifically, Cleveland claims the trial court erred in granting PDU's motion for temporary restraining order because the order failed to define the irreparable injury and state why it was granted without notice. Cleveland also argues the temporary restraining order was improperly granted without a showing that PDU had no adequate remedy at law.
 {¶ 30} However, the court granted the ex parte temporary restraining order on March 9, 2001. At the preliminary injunction hearing held on March 19, 2001, the parties represented to the court that they agreed to the reopening of Heaven Earth on the condition that PDU repair the building code violations. Thus, the temporary restraining order was effective for approximately ten days. Cleveland has failed to show how they were prejudiced by the court's granting of this motion. Therefore, even assuming the trial court erred in granting the motion for temporary restraining order, any such error would be harmless. Without a showing of prejudice, non-compliance with Civ.R. 65(A) is harmless error. Civ.R. 61; North Electric Co. v. United Steel Workers of America
(1971), 28 Ohio App.2d 253. Accordingly, the fifth assignment of error is overruled.
 {¶ 31} We affirm the court's decision granting the temporary restraining order and reverse the denial of Cleveland's motion for summary judgment. The case is remanded for the trial court to enter judgment consistent with this opinion.
 {¶ 32} It is, therefore, considered that said appellant and said appellees divide the costs herein.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, P.J. and SEAN C. GALLAGHER, J. concur.
[1] This case originally involved other plaintiff nightclubs with the same claims as PDU, but they later voluntarily dismissed their claims and are not parties to this appeal.