The STATE of Ohio ex rel. ROGERS, Atty. Gen., Appellant,

v.

ELBERT et al., Appellees.

[Cite as *State ex rel. Rogers v. Elbert,* 180 Ohio App.3d 284, 2008-Ohio-6746.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 07CA009105.

Decided Dec. 22, 2008.

286

Daniel J. Martin, for appellant.

David M. Leneghan, for appellees.

MOORE, Judge.

{¶ 1} Appellant, the state of Ohio on relation of the Ohio Attorney General ("the state"), appeals from a judgment of the Lorain County Court of Common Pleas that entered judgment against it on most of its claims that Lorne Elbert Jr., doing business as Elbert Excavating and Wrecking and Elbert Building Co., and Kasper Properties, Inc., also owned by Lorne Elbert Jr., had violated Ohio environmental laws. This court reverses and remands for proceedings consistent with this opinion.

I

{¶ 2} On September 8, 2003, at the request of the director of the Ohio Environmental Protection Agency ("OEPA"), the state filed a complaint against the defendants, alleging numerous violations of Ohio environmental law. The action involved a 38–acre parcel of property that the defendants owned on Oberlin Road in Elyria. The defendants had purchased the property at a sheriff's sale during 1997. The property included many vacant buildings and,

because the property apparently had been abandoned for several years, waste materials had been dumped throughout the property. Shortly after the defendants purchased the property and began demolition and excavation work at the site, OEPA became involved due to complaints from nearby residents. When OEPA inspectors first visited the property, they discovered piles of solid waste accumulated on the property. The local fire department also responded to the property on numerous occasions to extinguish large trash fires.

{¶ 3} OEPA later discovered 82 drums and additional containers of used oil on the property, many of which were leaking their contents onto the ground. The defendants had been burning the used oil to run space heaters in a maintenance building on the property. After learning that the defendants had received the used oil from an off-site supplier, OEPA advised them of several OEPA requirements for the storage and burning of the oil, including the requirements that they must test the oil to determine whether it contained impermissible levels of hazardous materials, that they could not burn the oil until they demonstrated that it met OEPA specifications, and that the oil must be properly stored and should not be discarded without OEPA authorization.

{¶ 4} OEPA later took samples from several of the drums. Chemical analysis confirmed that many of the samples of the used oil did not meet OEPA specifications and, in fact, qualified as hazardous waste because the oil contained halogen levels in excess of 1,000 parts per million. OEPA sent numerous letters to the defendants, detailing the environmental violations on the property and requesting that they work with OEPA to bring the property into compliance. The defendants never produced the required documentation, nor did they otherwise cooperate with OEPA.

{¶ 5} The state filed an amended complaint to add additional violations of environmental law, for a total of 21 counts. The state sought injunctive relief, as well as civil penalties. The alleged environmental violations involved the disposal of solid waste, open burning, the demolition of buildings on the site without OEPA authorization, the storage and disposal of hazardous waste, and the burning of used oil that did not meet OEPA specifications.

{¶ 6} After obtaining leave from the trial court, the state filed a motion for summary judgment and supported the motion with several affidavits of OEPA environmental specialists and hundreds of pages of pictures and other documents. The defendants filed a brief in opposition, as well as their own motion for summary judgment. The defendants supported their motion and response with a purported "affidavit" of Lorne Elbert Jr. that was not signed or notarized.

{¶ 7} The case ultimately proceeded to a bench trial without the trial court ruling on the motions for summary judgment. Following the evidentiary trial, the trial court found the defendants liable on two of the 21 counts in the state's

amended complaint. The trial court found that the defendants had demolished two buildings without properly notifying OEPA and that they had committed open burning on numerous occasions. The court held in favor of Elbert and Kasper on the remaining counts, finding that there was not sufficient evidence to support the state's remaining claims.

{¶ 8} The state appeals and raises three assignments of error. The defendants filed no brief on appeal and did not appear for oral argument. After oral argument by the state, this court stayed the proceedings and granted the state leave to supplement the record pursuant to App.R. 9 because several filings, including the state's motion for summary judgment, were missing from the record that the clerk's office transmitted to this court. This court now considers the appeal on the supplemented record. The assignments of error have been rearranged for ease of discussion.

## II

### ASSIGNMENT OF ERROR II

The court erred in [its] ruling that it did not find sufficient and credible evidence defendants violated Ohio's hazardous, used oil, and solid waste laws, and said ruling was against the manifest weight of the evidence.

{¶ 9} In its second assignment of error, the state contends that the trial court's verdict was against the manifest weight of the evidence in so far as it found that the state had failed to prove 19 of the 21 counts in its complaint. The trial court explained in its judgment that it did not "find sufficient and credible evidence to support the other alleged violations."

{¶ 10} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court clarified the distinction between the civil and criminal manifest-weight-of-the-evidence standards of review. The *Wilson* court stated that the civil manifest-weight-of-the-evidence standard was enunciated in *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus, which held that " '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Wilson* at ¶ 24. Under this standard, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact, and those determinations by the trier of fact are given great deference. See *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 15, 531 N.E.2d 333, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 11} Therefore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350. If the evidence against the verdict is not disputed and could not be interpreted in more than one way, however, the appellate court cannot construe the evidence in favor of the verdict. *Lovett v. Wenrich*, 2d Dist. No. 19497, 2003-Ohio-4587, 2003 WL 22026068, at ¶ 37. Thus, when the plaintiff presents evidence to support its claim, and there is no other evidence in the record to contradict that evidence, a verdict by the trier of fact that is inconsistent with that evidence is against the manifest weight of the evidence. See *Popson v. Pennington* (Aug. 14, 2000), 12th Dist. No. CA99–05–013, 2000 WL 1145515.

{¶ 12} "Although it has been generally recognized that a trier of fact is free to reject testimony even if that testimony is unrebutted, that is no longer true in civil cases in Ohio." *Conti v. Spitzer Auto World Amherst Inc.*, 9th Dist. No. 07CA009121, 2008-Ohio-1320, 2008 WL 754759, at ¶ 54, citing *Huntington Natl. Bank v. Chappell*, 9th Dist. No. 06CA008979, 2007-Ohio-4344, 2007 WL 2409795, at ¶ 22 (Dickinson, J., concurring). "Under *Wilson*, at least when a plaintiff presents sufficient evidence on each element of [its] cause of action, a defendant must present rebuttal evidence. If the defendant does not present rebuttal evidence, a judgment in the defendant's favor is now reversible because it is 'against the manifest weight of the evidence.'" Id.

{¶ 13} The state maintains that it presented evidence to support all of the claims at issue and that its evidence was not disputed or rebutted by the defendants. Consequently, the state argues that a judgment in favor of the defendants on these claims was against the manifest weight of the evidence. We agree.

{¶ 14} To organize a review of the trial court's judgment for the defendants on counts one, two, and five through 21 of the state's complaint, this court will group those counts into three categories: (1) solid-waste disposal (counts one, two, and five), (2) hazardous-waste disposal or storage (counts six through 15), and (3) burning of used oil (counts 16 through 21).

### Solid Waste Disposal

{¶ 15} The state alleged that when OEPA initially came to inspect the property after the defendants purchased it in 1997, inspectors discovered scrap tires, bag house dust, foundry sand, and demolition debris deposited on the property. The accumulation of these materials on the property formed the allegations in counts one, two, and five. The state alleged that the defendants had improperly disposed of solid waste on the property, that in so doing they had

violated Ohio law by open dumping and operating an unlicensed solid-waste disposal facility, and that they had further violated Ohio environmental law by excavating on the site of a solid-waste disposal facility without OEPA authorization.

{¶ 16} Open dumping is prohibited by R.C. 3734.03. R.C. 3734.01(I) defines open dumping to include "the depositing of solid wastes * * * onto the surface of the ground at a site that is not licensed as a solid waste facility."

{¶ 17} R.C. 3734.02(C) prohibits the creation or operation of a solid-waste disposal facility without obtaining a permit from OEPA. R.C. 3734.01(E) defines "solid wastes" to include unwanted residual material from industrial or commercial operations, nontoxic foundry sand, garbage, and scrap tires. R.C. 3734.01(F) defines "disposal" to include depositing, dumping, or placing solid wastes on the land. A "facility" is defined in R.C. 3734.01(N) to include any tract of land. Although R.C. 3734.02(D) includes exceptions from the permit requirement, such as for single-family residences and for the temporary storage of materials other than scrap tires, none of the exceptions was applicable to the facts alleged by the state.

{¶ 18} The state further alleged that the defendants had violated Ohio law by excavating this site without obtaining authorization from OEPA. R.C. 3734.02(H) prohibits "filling, grading, [or] excavating" on the site of a solid-waste facility without obtaining prior authorization from OEPA.

{¶ 19} The state presented evidence at trial that demonstrated each of the violations that it alleged through counts one, two, and five. The state presented the testimony of two OEPA environmental specialists who had inspected the property on several occasions, observed the solid-waste violations, and recorded some of their observations with pictures. The state presented the testimony of the inspectors, the pictures taken by them, and copies of written correspondence to and from the defendants pertaining to these counts.

{¶ 20} OEPA specialist Kim Gallagher testified that she first inspected the property on March 18, 1997, after receiving a complaint from a neighbor about open dumping at the property. During her inspection, she observed piles of construction debris; 100–200 scrap tires; construction demolition debris, some of which was on fire; and a bulldozer running through and around the piles of debris. Because the property included the site of a former foundry and landfill, OEPA considered the site a solid-waste disposal area. Gallagher further testified that the defendants had never applied for or received a permit to operate a solid-waste disposal facility on the site. OEPA sent a written notice to the defendants that they were in violation of open-dumping and solid-waste disposal laws and explained what would be necessary to abate the violations.

{¶ 21} Gallagher inspected the property again on April 9, 1997, and observed that the scrap tires were still present, there was again waste burning, additional waste had been piled on the ground, and the area had been further filled and graded. She further testified that the defendants had never received authorization from OEPA to grade and fill this area.

{¶ 22} In early May 1997, the defendants responded to the March OEPA violation letter and indicated that they would remove the waste, that they would stop burning waste, and that they intended to apply for a solid-waste permit. Nonetheless, the violations did not stop and the defendants never applied for a solid-waste permit.

{¶ 23} Gallagher explained that the solid-waste violations persisted, and she verified that through numerous additional inspections of the property. OEPA sent additional correspondence to the defendants and even met with Elbert personally, but to no avail. During an inspection in August 2000, OEPA discovered that scrap tire shreds had been graded into the ground, an impermissible means to dispose of the waste. By March 2002, OEPA observed that the original pile of scrap tires had been removed, but it also observed that excavation at the site had buried piles of debris in the ground, which she explained was also impermissible under OEPA regulations.

{¶ 24} Another OEPA inspector, Clarissa Gereby, testified that she visited the site in August 2004 and January 2005 to determine whether there had been any change in the prior solid-waste violations. During these visits, she observed large piles of waste material still accumulated at the site. She sent further correspondence to the defendants about the violations. By this point, the property was also being inspected by the Lorain County Health Department, which conducts inspections of solid-waste disposal facilities. Gereby explained that it had been approximately 3,500 days since the OEPA had first observed the defendants committing open dumping, unlawful disposal of solid wastes, and illegal grading of the area, and that most of the violations had continued throughout that period.

{¶ 25} Although the defendants presented evidence that some of the debris the OEPA had observed on the property during 1997 had been dumped there by unknown people, Elbert testified that he continued to accumulate solid-waste piles on the property, including waste that he brought to the site from other locations. The defendants also admitted that they had moved the waste around and graded the area. Elbert testified that he was unaware of all the environmental regulations and that he never obtained any permits or authorization for his activities from OEPA because he believed that he did not need them.

{¶ 26} Elbert did not dispute that he had received all of the detailed correspondence that OEPA sent to him. Although the defendants expressed their belief

that OEPA had made unreasonable and potentially costly demands on them, they failed to present any evidence to contradict the state's evidence that they had committed the solid-waste violations at issue, that OEPA had put them on notice of the violations, or that the violations had continued for a long period of time.

### Hazardous–Waste Disposal or Storage

{¶ 27} The violations in counts six through 15 of the state's complaint pertain to the defendants' alleged storage of hazardous waste on the property. The state alleged that the defendants had used the property to store and dispose of used oil that constituted hazardous waste. The state further alleged that by storing or disposing of hazardous waste on the property, the defendants had violated Ohio law by failing to obtain a license for the facility and that they had failed to comply with other legal requirements connected to the operation of a hazardous-waste disposal facility.

{¶ 28} The Ohio Revised Code distinguishes hazardous waste from nonhazardous solid waste, due to the additional environmental danger posed by hazardous waste, and imposes tighter restrictions on its storage and disposal. R.C. 3734.01(M) defines "storage" with reference to hazardous waste to include "the holding of hazardous waste for a temporary period in such a manner that it remains retrievable and substantially unchanged physically and chemically and, at the end of the period, is treated; disposed of; stored elsewhere; or reused, recycled, or reclaimed in a beneficial manner." "Disposal" is defined in R.C. 3734.01(F) to include "the discharge, deposit, injection, dumping, spilling, leaking, emitting, or placing of any * * * hazardous waste into or on any land or ground."

{¶ 29} Due to the potential for used oil to contain hazardous chemicals, the Ohio Administrative Code devotes an entire chapter to the collection and re-use of used oil. See Ohio Adm.Code 3745–279. Used oil qualifies as hazardous waste if its content of certain chemicals exceeds specified levels. Ohio Adm.Code 3745–279–10(B)(1)(b) provides:

> Used oil containing more than one thousand parts per million (ppm) total halogens is presumed to be a hazardous waste because it has been mixed with halogenated hazardous waste listed in rules 3745–51–30 to 3745–51–35 of the Administrative Code. Persons may rebut this presumption by demonstrating that the used oil does not contain hazardous waste.

{¶ 30} The state's counts six through 15 were all premised on allegations that the defendants had stored and disposed of used oil on the property and that oil contained impermissible levels of halogens and, therefore, was presumed to be hazardous waste.

{¶ 31} The hazardous-waste counts included allegations that the defendants stored hazardous waste on the property without obtaining a permit from OEPA

and that, in so doing, they had operated an unlicensed hazardous-waste disposal facility (see R.C. 3734.02(E) and 3734.02(F); Ohio Adm.Code 3745–55–13(A); Ohio Adm.Code 3745–52–11); generated and stored hazardous waste without conducting the requisite testing and without ensuring that the storage containers were in good condition and stored in a manner to prevent rupture or leakage (see, e.g., Ohio Adm.Code 3745–55–73(B) and 3745–54–13); failed to have a written plan for closure of the facility, failed to remove the hazardous wastes in accordance with a closure plan, and failed to obtain a cost estimate or establish financial assurances for closure of the facility (see Ohio Adm.Code 3745–55–12, 3745–55–42, and 3745–55–43); and that they had violated Ohio Adm.Code 3745–55–47 and R.C. 3734.11(A) for failing to carry insurance to cover their potential liability for tort claims arising out of their operation of a hazardous-waste disposal facility.

{¶ 32} The state presented testimony of some OEPA personnel who had investigated these alleged violations. Wade Balser testified that on August 26 and September 15, 2004, he and Frank Zingales, another OEPA environmental specialist, inspected the property and observed 82 large drums of used oil that were stored near piles of solid waste. Most of the drums were rusted or otherwise in poor condition, and many were not properly sealed. To support Balser's testimony, the state presented photographs and videotaped recordings that the inspectors had taken during those two visits. From the videotape, which was partially narrated by Balser, it was apparent that most of the oil drums were extremely rusty, some were bent or otherwise damaged, several were open, and there was visible oily spillage on and around many of the oil drums. Pools of liquid had accumulated on top of, down the sides of, and underneath many of the drums. According to Balser's testimony and as depicted in the videotape, a heavy oily sheen appeared on several pools of water on the ground, and some of the liquid pools appeared to be more oil than water. Several of the drums were unsealed because they were punctured, had rusted through, or were missing their "bings" or caps.

{¶ 33} The inspectors labeled each of the drums with an identification number. Although OEPA repeatedly informed the defendants that they were obligated to test the contents of the drums, they never did. OEPA inspectors returned to the property during November 2004 and took samples from several of the drums. Testing of the samples by an outside laboratory confirmed that half of the samples contained hazardous wastes. Frank Zingales testified that the results of the testing revealed that many of the drums contained used oil with halogen levels in excess of 1,000 parts per million that were presumed to be hazardous waste pursuant to the administrative code. The contents of several other drums qualified as hazardous waste because the flash points of the liquid were below 140

degrees. In other words, the contents of some of the drums were hazardous because they were highly flammable. The testing also revealed that some of the drums contained unacceptable levels of other hazardous substances, including benzene, trichloroethylene, and tetrachloroethylene. Further sampling and testing confirmed that some of the drums had leaked hazardous waste onto the ground. The defendants never did any of their own testing of the contents of the drums, nor did they dispute the results of the OEPA testing.

{¶ 34} In October 2004, the defendants sent a proposal to OEPA for the removal of some of the oil drums, but OEPA found the proposal to be deficient and notified Elbert about the deficiencies in the plan. When OEPA inspectors returned to the property in August 2005, however, they discovered that the defendants had removed several of the drums of used oil without any notice to or authorization from OEPA.

{¶ 35} Although the defendants eventually attempted to develop a closure plan for the hazardous waste site, they failed to submit a plan that OEPA approved. OEPA witnesses explained that a closure plan would include proper testing to determine the extent of contamination at the site and, if necessary, a plan to remedy the contamination. After OEPA determined that hazardous waste had leaked or spilled onto the ground, the defendants were required to determine the extent to which the contamination had migrated into the environment. The defendants hired a firm owned by Edward Haddad to do some sampling of the ground where the oil had spilled, but by Haddad's own admission, he used a sampling method that did not meet OEPA specifications. Moreover, he explained that his testing was further impeded by the fact that the drums were no longer on the property and he did not know the exact locations where the spillage had occurred.

{¶ 36} The defendants' evidence on these claims failed to contradict any of the state's material evidence. Haddad merely explained the efforts that he had made to test for contamination. The defendants did not dispute or contradict any of the state's evidence that the defendants had stored and disposed of hazardous waste on the property or that they had failed to comply with any of the legal requirements for the storage or disposal of hazardous waste.

### Burning of Used Oil

{¶ 37} The remaining counts in the state's complaint also pertain to the used oil on the property, but are discussed separately because these counts focused primarily on the defendants' burning of the oil. The state alleged that the defendants burned used oil on the property to generate heat, but that they had failed to comply with many of the requirements set forth in Ohio Adm.Code 3745–279.

{¶ 38} Specifically, the state alleged that the defendants burned used oil from an off-site source that failed to meet OEPA specifications (see Ohio Adm.Code 3745–279–23; Ohio Adm.Code 3745–279–67); failed to properly test the oil and retain the test results (see Ohio Adm.Code 3745–279–72); failed to use adequate measures to store the used oil (see Ohio Adm.Code 3745–279–60, 3745–279–64, and 3745–279–67); failed to keep proper records of each used oil shipment (see Ohio Adm.Code 3745–279–65); and failed to notify OEPA that they were burning off-specification used oil (see Ohio Adm.Code 3745–279–66).

{¶ 39} OEPA inspector Frank Zingales testified that during his inspections that focused on the defendants' storage of used oil on the property, he discovered that the defendants were accepting used oil shipments from an off-site supplier and were burning used oil to provide heat for one of the buildings. Elbert repeatedly told Zingales that the oil came from an off-site commercial supplier of used oil. Although Elbert had expressed his belief that the oil was used automotive oil, Zingales explained that the test results tended to suggest that at least some of the oil was industrial waste because the testing had detected the presence of industrial solvents that would not be found in used automotive oil.

{¶ 40} Zingales explained that under Ohio law, because the used oil was generated from an off-site commercial supplier, the defendants could not burn the oil unless they established that it met OEPA specifications. Specifically, they were required to demonstrate that the oil did not contain impermissible levels of certain constituents and, therefore, that it could be burned without creating an undue hazard to the environment.

{¶ 41} As explained above, the defendants never tested the oil, but OEPA did. OEPA test results created a presumption that some of the oil was hazardous waste and, therefore, could not be legally burned in the defendants' used oil burner. Although there were many different drums of oil on the defendants' property, some of which might have contained used oil that met OEPA specifications, it was the defendants' burden to establish that the oil they were burning met OEPA specifications. They were required to keep records of all their used oil shipments and were required to test all off-site used oil before they burned it. The defendants never tested the oil, and they never kept any records about the suppliers, dates, or quantities of oil that they accepted from other sources.

{¶ 42} The defendants' evidence did not dispute any of the facts concerning these violations. Elbert admitted that he burned used oil on the property and that most of the oil came from an off-site commercial source. He further admitted that he did not keep records of the used oil shipments or deliveries and that he never had the oil tested because he believed it was safe to burn.

## Conclusion

{¶ 43} Given that the state presented undisputed evidence that the defendants had committed all of the violations it alleged pertaining to disposal of solid waste, storage and disposal of hazardous waste, and burning used oil, the trial court's judgment against it and in favor of the defendants was against the manifest weight of the evidence. The second assignment of error is sustained.

## ASSIGNMENT OF ERROR I

The court erred in denying the state's motion for summary judgment.

{¶ 44} In its first assignment of error, the state contends that the trial court erred in denying its motion for summary judgment on the issue of the defendants' liability for the environmental violations. Although the trial court never expressly denied the summary-judgment motion, it can be presumed that it implicitly did so by proceeding to trial without ruling on the motion. See *Lorence v. Goeller*, 9th Dist. No. 04CA008556, 2005-Ohio-2678, 2005 WL 1283713, at ¶ 47.

{¶ 45} Because the state was ultimately granted judgment in its favor on counts three and four of its complaint that alleged illegal open burning and illegal demolition of buildings, it has no standing to appeal the denial of summary judgment on these claims. Although the state may have been temporarily aggrieved by the trial court's interlocutory order that denied its motion for summary judgment on counts three and four, because it ultimately prevailed on those claims, the state was not an aggrieved party on those claims and has no right to assign error to that aspect of the trial court's denial of its motion for summary judgment. See *BFG Fed. Credit Union v. CU Lease, Inc.*, 9th Dist. No. 22590, 2006-Ohio-1034, 2006 WL 544493, at ¶ 37. Thus, we will confine our review to the propriety of the trial court's denial of summary judgment on the remaining 19 claims in the state's complaint.

{¶ 46} It is generally held that "any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 156, 642 N.E.2d 615.

{¶ 47} In reaching the substance of the issue raised in *Continental*, however, the court explicitly premised its analysis on two key assumptions: (1) that the summary-judgment motion was meritorious and (2) that the subsequent verdict in favor of the opposing party "was not against the manifest weight of the evidence." Id. at 157, 642 N.E.2d 615. The court explained that it was weighing the equities of whether a correct decision based on less evidence (at the preliminary summary

judgment stage) should prevail over a correct verdict based on more evidence (after it had been more fully developed at trial). The court's rationale was that a correct judgment based on more complete evidence should prevail. The potential for injustice that guided the court's reasoning in *Continental* is not present here because the trial court's verdict *was* against the manifest weight of the evidence. Therefore, the *Continental* holding is inapplicable to the facts of this case.

{¶ 48} Because this court has determined that the trial court's verdict was against the manifest weight of the evidence and that the case must be remanded to the trial court, the issue of whether the trial court also erred in denying the state's motion for summary judgment clearly is not moot or harmless. Although this court's reversal on the weight of the evidence entitles the state to a new trial, a reversal on the summary-judgment issue would entitle the state to judgment in its favor. Therefore, this court will review the merits of the state's challenge to the trial court's denial of its summary-judgment motion.

{¶ 49} Pursuant to Civ.R. 56(C), summary judgment is proper if:

(1) [N]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party.

*State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189.

{¶ 50} A party moving for summary judgment bears an initial burden of pointing to "some *evidence* of the type listed in Civ.R. 56(C) which affirmatively shows that the nonmoving party has no evidence to support [the nonmoving] party's claims." (Emphasis sic.) *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. A plaintiff moving for summary judgment does not bear the initial burden of addressing the nonmoving party's affirmative defenses. See *Todd Dev. Co. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, at syllabus. When a moving party has met this initial burden, "the nonmoving party may not rest on the mere allegations of [its] pleading, but [its] response * * * must set forth specific facts showing the existence of a genuine triable issue." *State ex rel. Burnes v. Athens Cty. Clerk of Courts* (1998), 83 Ohio St.3d 523, 524, 700 N.E.2d 1260.

{¶ 51} Evidence submitted to either support or oppose summary judgment must comply with Civ.R. 56. A proper affidavit under Civ.R. 56(E) must, among other things, be based on personal knowledge. "Personal knowledge" has been defined as "knowledge of factual truth which does not depend on outside information or hearsay." *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 335, 666 N.E.2d 235. It is also fundamental that to properly be

considered under Civ.R. 56, an affidavit must be signed and notarized. See *Scott v. Hertz Corp.*, 10th Dist. No. 05AP–1180, 2006-Ohio-4982, 2006 WL 2734051, at ¶ 22.

{¶ 52} We must begin by noting that the state made no argument to the trial court that it was entitled to summary judgment on count 13 of its complaint, which alleged that the defendants had generated hazardous waste and failed to have it tested to determine whether it was hazardous, as required by Ohio Adm.Code 3745–52–11. As the state made no argument, it failed to point to any evidence to support count 13. Therefore, the trial court did not err in denying summary judgment to the state on count 13 of its complaint.

{¶ 53} Without detailing every piece of evidence presented by the state, the record reveals that the state's summary-judgment motion pointed to evidence to support each of the violations that it alleged through the remaining counts in its complaint. The state presented the affidavits of OEPA environmental specialists, which incorporated other attached documents and photographs and which were essentially a condensed version of the evidence it later presented at trial.

{¶ 54} OEPA environmental specialists who had observed each of the violations submitted affidavits that briefly summarized their observations at the property and their interactions with the defendants. Their affidavits incorporated attached documents, including photographs that they had taken while at the site and correspondence that they had sent to and received from the defendants and their representatives. The evidence further explained the sampling and testing of the used oil and that given the results of the testing, some of the samples were presumed to be hazardous waste. The testing documentation, consisting of hundreds of pages of data and analysis, was also attached.

{¶ 55} The state pointed to evidence that the defendants never had a permit to operate a solid-waste or a hazardous-waste disposal facility, nor did they attempt to work with OEPA to resolve the environmental violations on the property. Despite years of OEPA representatives sending correspondence to the defendants and personally visiting the property, with repeated requests that the defendants respond to the agency's allegations, the defendants never submitted any of the required documentation, nor did they submit other evidence that they had corrected any of the violations that had been alleged by OEPA.

{¶ 56} In October 2004, Elbert sent a proposal to OEPA for the removal of some of the oil drums, but OEPA found the proposal to be deficient and notified Elbert about the deficiencies in the plan. The defendants had proposed that they would have the oil hauled away by a used oil dealer who was not authorized to transport hazardous waste. When OEPA inspectors returned to the property in

August 2005, however, they discovered that the defendants had removed several of the drums of used oil without any notice to or authorization from OEPA.

{¶ 57} In their brief in opposition to summary judgment on these counts, the defendants did not dispute the facts alleged by the state, nor did they point to any evidence to rebut the presumption created by the state's evidence that some of the used oil on the property contained impermissible levels of halogens and was therefore hazardous waste. The defendants failed to point to any evidence to dispute the state's evidence. They merely attached what they purported to be a one-page "affidavit" of Lorne Elbert Jr., but the document was not signed by Elbert, nor was it notarized. Moreover, the statements made within the document do not appear to be based on personal knowledge. Thus, as a matter of law, the defendants' "evidence" was not proper evidence under Civ.R. 56 and could not create a factual dispute about any of these counts.

{¶ 58} Given that the state presented undisputed evidence that the defendants had committed the violations alleged in counts one, two, five through 12, and 14 through 21, the trial court erred in denying the state's motion for summary judgment on the defendants' liability on those counts of its complaint. The first assignment of error is sustained to that extent, and the matter must be remanded for the trial court to determine the appropriate relief that the state should be granted.

### ASSIGNMENT OF ERROR III

The trial court's civil penalty for air violations was unreasonable given the *Dayton Malleable* factors and the miniscule amount of the penalty in relation to the statutory maximum.

{¶ 59} In its third assignment of error, the state challenges the relief granted by the trial court in its judgment on counts three and four for the defendants' illegal demolition of buildings and open burning. The assessment of an appropriate civil penalty lies within the sound discretion of the trial court and will not be reversed upon appeal absent evidence that the trial court abused its discretion in imposing the penalty. *State ex rel. Brown v. Dayton Malleable* (1982), 1 Ohio St.3d 151, 157, 1 OBR 185, 438 N.E.2d 120.

{¶ 60} The trial court imposed a total fine of $200 for the two violations of demolishing buildings that could have contained asbestos without testing the materials or notifying OEPA. On the seven acts of open burning, the trial court imposed a total fine of $350. The maximum fine for each of the nine violations was $25,000 per day. Although the trial court noted that it was exercising its sound discretion in selecting the appropriate penalties, it offered no explanation for imposing such minimal fines in this case. The trial court had discretion to

impose civil penalties in this case, but it was required to exercise its discretion within the appropriate parameters.

{¶ 61} Civil penalties imposed for violations of environmental regulations are primarily deterrent in nature. Id. The penalties are "designed to deter conduct which is contrary to a regulatory scheme." *State ex rel. Celebrezze v. Thermal–Tron, Inc.* (1992), 71 Ohio App.3d 11, 19, 592 N.E.2d 912. To be an effective deterrent, the penalty imposed "must be large enough to hurt the offender," and the court should further consider "the good or bad faith of the defendant, the financial gain to the defendant as well as environmental harm." Id.

{¶ 62} The trial court indicated in its judgment that it had considered the good and bad faith of the defendants, as well as the economic benefit to them. The trial court failed to mention, however, whether it had considered the harm to the environment and whether the penalties were large enough to hurt the offenders. Given that each fine imposed was less than one percent of the maximum allowable, despite repeated violations by the defendants even after notice from OEPA, it is apparent that the trial court did not impose fines that were large enough to financially hurt the defendants and deter future violations, nor did it consider the harm caused to the environment.

{¶ 63} The defendants had been profiting from their activities on this property, and the evidence suggested that they failed to consider the environmental impact of their activities. Despite repeated notices from OEPA, their open burning of waste on the property continued. As Elbert explained when he testified, the defendants bought the property for only $1,000 an acre, but they needed to clean it up to make it commercially useful to them. Although the evidence suggested that there may have been little harm to the environment by the demolition of the two buildings because no asbestos was detected, there likely was harm caused by some of the raging waste fires. The fire chief testified that the fire department responded to several fires, some of which involved enormous piles of burning debris that required thousands of gallons of foam and water to extinguish.

{¶ 64} The fine imposed for the repeated fires was minuscule compared to the apparent profits that the defendants were making on this property. The defendants had consistently been involved in business ventures on the property from which they were profiting, including leasing existing buildings and storage space and selling salvageable waste materials. Moreover, the evidence revealed that the defendants purchased this property for an extremely discounted price and had already resold a portion of it at a profit of $85,000.

{¶ 65} Given that this court is remanding the matter for the trial court to consider all of the above factors and grant the state relief on its solid-waste,

hazardous-waste, and oil-burning claims, it would be appropriate for the trial court to fashion relief that addresses the state's claims as a whole. The third assignment of error is sustained.

## III

{¶ 66} The state's first assignment of error is sustained as to all counts except count 13. The state's second and third assignments of error are sustained. The judgment of the Lorain County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

CARR, P.J., concurs in judgment only.

DICKINSON, J., concurs.