

**D.M., Appellant,**

v.

**J.M., Appellee.**

[Cite as *D.M. v. J.M.*, 189 Ohio App.3d 723, 2010-Ohio-3852.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24801.

Decided Aug. 18, 2010.

Steve C. Bailey, for appellant.

Dean S. Hoover, for appellee.

---

BELFANCE, Judge.

{¶ 1} D.M. appeals the ruling of the Summit County Court of Common Pleas, Domestic Relations Division, that reallocated parental rights and responsibilities from appellant to appellee. We affirm.

## I

{¶ 2} Appellant, D.M. ("Mother"), and appellee, J.M. ("Father"), were granted a divorce in May 2004. Mother was named the residential parent of the couple's three minor children. Mother and Father have been involved in contentious litigation since that time. In 2005, Mother obtained a civil protection order against Father. Father filed two civil lawsuits against Mother, which he dismissed. In 2005, Father brought a motion for modification of custody, which he withdrew upon resolution of the matter.

{¶ 3} The couple's oldest daughter suffered from mitochondrial disease and passed away in December 2006. Mitochondrial disease refers to any one of the at

least 1,500 diseases in which a person's body does not make enough energy to support the body's functions. The disorder inhibits the body's ability to function normally and can affect, for example, the muscles, nervous system, digestive system, or multiple systems. Because mitochondrial disease is often genetically inherited, both parents were concerned that their youngest daughter, M.M., might also be afflicted with the disease. Father contacted Dr. Bruce Cohen, an expert in mitochondrial disease at the Cleveland Clinic, who had treated M.M.'s older sister. The parties also consulted with Dr. Natowicz, another physician at the Cleveland Clinic. Although the diagnosis of mitochondrial disease can be at times verified through a muscle biopsy, the parties, in consultation with Dr. Cohen, declined to engage in that invasive procedure. Eventually, the parties were told that M.M. also suffered from the disease. Dr. Cohen recommended that the parties give M.M. a "mitochondrial cocktail" that consisted of a variety of vitamins that are believed to be helpful to persons suffering with the disease.

{¶ 4} M.M.'s primary physicians were at Akron Children's Hospital ("Children's"). Mother, who is a nurse, had the primary responsibility for caring for M.M.'s older sister as well as M.M. According to the guardian ad litem, Mother's excellent care is the reason M.M.'s sister lived as long as she did. Mother and Father often attended meetings with doctors together; however, in light of Father's travel schedule, Mother also attended meetings when Father was absent. Mother kept extensive records regarding her observations of M.M.'s symptoms and would report these symptoms to the doctors. These symptoms, which can be indicative of mitochondrial disease, included fatigue, elevated heart rate, low blood pressure, heat intolerance, night terrors, diarrhea, and food intolerance. M.M.'s treatment became progressively more invasive and involved. In consultation with M.M.'s doctors, a "G-tube" was inserted into M.M. to provide nourishment. In addition, a "Mediport" was surgically implanted to treat what appeared to be a gamma-globulin deficiency. Both parents were involved in the consultation and decision to implant the devices. The doctors at Children's consulted with Dr. Cohen regarding the procedures. After an initial discussion, Dr. Cohen contacted M.M.'s physician to ensure that the doctor felt it was necessary to proceed with the G-tube. Dr. Cohen was told by that doctor that the procedure was necessary. As a result, M.M. received her nutrition by way of the G-tube and did not eat ordinary food. M.M. was required to conduct her daily activities wearing a heavy backpack and generally, had a very limited lifestyle. At night, M.M. was hooked to an IV, which was in her bedroom.

{¶ 5} Although Father did not often observe the symptoms that Mother reported, he largely deferred to Mother regarding M.M.'s care because of Mother's medical training and because she was with M.M. the majority of the time. Mother was often critical of the manner in which Father cared for M.M.

and contacted the guardian ad litem and M.M.'s doctor's to report her concerns regarding Father's care. Father felt obligated to follow Mother's precise directives, and Father would be denied companionship if he questioned Mother regarding M.M.'s care. Father made an effort to allow M.M. to engage in activities typical for a child of M.M.'s age. Mother tended to be more restrictive and viewed these activities as posing a great risk to M.M.'s health.

{¶ 6} In early November 2007, M.M. was admitted to Children's on two separate occasions. Dr. Peter Cooper White, who was treating M.M. and had examined her medical history, began to question whether M.M. actually had mitochondrial disease. A conference was convened involving all of M.M.'s treating physicians. Dr. Bruce Cohen participated by telephone. Dr. Daryl Steiner, director of the Care Center at Children's, was also asked to consult on the matter in order to determine whether M.M. was a victim of her Mother's Pediatric Condition Fabrication ("PCF"), formerly known as Munchausen Syndrome by Proxy.[1] PCF is a psychological condition in which usually the parent falsifies or exaggerates symptoms in order to convince others that the child is ill. The physician who ordered the implantation of the feeding tube was not present at the meeting. In addition, the doctors did not contact the doctor who had originally detected the gamma-globulin deficiency and had recommended the installation of the Mediport.

{¶ 7} As a result of this conference, the physicians questioned the accuracy of M.M.'s diagnosis. They also became suspicious that Mother may have falsified or exaggerated M.M.'s symptoms. The group decided that all medical intervention should be withdrawn, including M.M.'s surgically implanted feeding tube and Mediport. The group also believed that the likelihood of being able to bring about significant change in M.M.'s medical care would be impossible with Mother making the decisions. Although Dr. Steiner had never met Mother, based upon the conference, he prepared a document entitled "Suspected Child Abuse and Neglect Record/Consultation," in which he asserted that Mother had pursued medical treatment for an illness that had never been diagnosed and that Mother's pattern of behavior was consistent with "Fictitious Illness by Proxy Syndrome," also known as Munchausen Syndrome by Proxy. The doctors also decided that it was appropriate to refer the matter to the Summit County Children's Services Board ("CSB") to assist with the withdrawal of the medical treatment.

{¶ 8} Dr. Cooper White spoke to Mother and told her about the meeting. Mother was surprised to learn that he and the other doctors felt that M.M. did not have mitochondrial disease. Dr. Cooper White told Mother that the doctors recommended the removal of the surgically implanted devices and the cessation

---

1. This syndrome has also been referred to as "Fictitious Illness by Proxy Syndrome."

of medications. He also informed Mother that CSB was involved. Mother agreed to the recommendations. Dr. Cooper White did not believe that Mother agreed to follow the physicians' advice out of concern about CSB's involvement. Dr. Steiner was unaware that Mother had agreed to the recommendations.

{¶ 9} CSB contacted Ellen Kaforey, the guardian ad litem and parent coordinator. She was informed that CSB intended to take custody of M.M. The guardian ad litem promptly filed an emergency motion for transfer of custody to Father. In this motion, she attached the document that Dr. Steiner had prepared. The trial court immediately issued an order granting custody to Father and prohibiting Mother from having any contact with M.M. or Children's. After filing the motion, the guardian ad litem told Mother that she was not convinced that Mother suffered from PCF. The guardian ad litem explained that although she was not convinced of the diagnosis, she felt that it was better for M.M. to be with Father instead of in a foster home.

{¶ 10} In light of the accusations concerning Mother's alleged falsification of M.M.'s symptoms, Mother promptly submitted to a full evaluation by an expert on PCF. The record reflects that Mother filed several motions in which she averred that she did not have PCF and in which she attached the expert's report. In late November 2007, a hearing took place regarding the motion for emergency custody. The magistrate entered an order on January 3, 2008 in which Mother's request for visitation was denied. Subsequent to this order, Mother filed several motions seeking visitation with M.M. and other relief. Mother's motions were never heard by the court. As a result, Mother had no contact with M.M. for many months. Eventually, the guardian ad litem intervened to establish visitation because M.M. wanted to see Mother. Further discussions ensued concerning the entry of a court order for companionship; however, according to Mother and her counsel, the proposed order did not contain all of the agreed terms. Ultimately, in September 2008, the trial court entered an order for supervised companionship between Mother and M.M. for one day per week. This order was marked "seen but not approved" as to Mother and her counsel.

{¶ 11} In June 2008, Father filed his motion seeking the reallocation of parental rights and responsibilities. Several months later, the guardian ad litem filed a notice of dismissal of her November 2007 emergency motion.

{¶ 12} An evidentiary hearing on Father's motion took place before a magistrate. Father's witnesses were Dr. Steiner, Dr. Cooper White, and Dr. Cohen. Father also offered his own testimony and Mother's. Mother's witnesses included the guardian ad litem, Dr. Boles, an expert in mitochondrial disease, and two nurses who cared for M.M. and had observed M.M.'s symptoms. The parties stipulated that the court could take judicial notice of a psychological evaluation of Mother in 2005 and was located in the Family Court Services file.

{¶ 13} The record reflects that Father did not substantiate the original allegation that Mother was afflicted with PCF, as none of the witnesses offered testimony that Mother was diagnosed with the disorder or that M.M. was a victim of child abuse. Dr. Steiner and Dr. Cooper White related the circumstances surrounding the November 2007 physician's meeting. At best, their testimony reveals that the physicians suspected that M.M. was a victim of Mother's PCF and that Mother had falsified or exaggerated M.M.'s symptoms. Dr. Cooper White ultimately concluded that M.M. had been overtreated and that the medical profession had failed M.M. He did not believe that Mother was responsible for the medical care that M.M. received. He acknowledged that M.M.'s medical records reflect a consistent diagnosis of mitochondrial disease and that if a parent was told of this diagnosis, it would be reasonable to assume that the diagnosis was true. Dr. Cooper White had no knowledge that any medical professional had ever suggested to Mother that M.M. did not have a mitochondrial disease. Dr. Boles, Mother's expert, also believed that M.M. had been overtreated and that there had been insufficient communication between the mitochondrial specialists and M.M.'s other doctors.

{¶ 14} Dr. Cooper White also stated that he was never able to conclude that Mother had made up M.M.'s symptoms. He also acknowledged laboratory testing that verified symptoms associated with mitochondrial disease. Likewise, Dr. Steiner could not recall a single instance in which Mother had falsified M.M.'s symptoms. He also acknowledged that many of the attributes of PCF, such as physician shopping and lack of communication among doctors, were not present in this case. Dr. Steiner also conceded that other than speculation, there was no specific evidence that Mother had made up or exaggerated any symptoms. There was also acknowledgement that once the medical devices were removed, Mother did not pose a threat to M.M. Mother presented the testimony of two nurses who were present in the home and had personally observed many of the symptoms Mother reported to the doctors.

{¶ 15} Dr. Cohen testified that at the November 2007 physician's meeting, he concluded that M.M. was not afflicted with mitochondrial disease. However, his opinion was premised upon the presumption that the symptoms that had been reported to him were not true. Mother's expert, Dr. Boles, opined that M.M. is afflicted with a mild form of mitochondrial disease. He explained that it is common for one family member to be severely afflicted with the disease and others to be mildly affected. He acknowledged that it is more difficult to diagnose the mildly affected person. In reviewing M.M.'s medical records, Dr. Boles stated that there were symptoms of mitochondrial disease present in M.M. and that M.M.'s lab testing was highly consistent with the reported symptoms. Dr. Boles also stated that the symptoms that had been reported were not only

consistent but "classic" in a patient with mild mitochondrial disease. Dr. Boles also explained that it was typical for children with a mild form of the disease to have more problems when younger, around age three to five. Such children may then become asymptomatic through the school-age years until puberty, because puberty imposes higher energy demands on the body. He stated that M.M.'s current lack of symptoms does not make it less likely that she is afflicted with mitochondrial disease. He also recommended that M.M. be closely monitored by her physicians.

{¶ 16} The magistrate recommended that parental rights and responsibilities be reallocated to Father. Mother objected to the magistrate's decision, and all of her objections were overruled by the trial court. Mother has timely appealed from the trial court's judgment.

## II

### Assignment of Error Number One

The trial court erred in upholding the magistrate's decision as that decision was not supported by the manifest weight of the evidence and the evidence did not support the conclusion that a change of custody was necessary.

### STANDARD OF REVIEW

{¶ 17} A trial court possesses broad discretion with respect to its determination of custody, and its decision will not be overturned absent an abuse of discretion. See *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846. Thus, the trial court's determination will not be disturbed unless the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. As Mother also challenges the trial court's factual findings, its decision regarding questions of fact should be reversed if it is against the manifest weight of the evidence. See, e.g., *Scott v. Hong*, 9th Dist. Nos. 08CA0010 and 08CA0018, 2009-Ohio-780, 2009 WL 427442, at ¶ 18; *State ex rel. Rogers v. Elbert*, 180 Ohio App.3d 284, 2008-Ohio-6746, 905 N.E.2d 235, at ¶ 10–11. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

### "BEST INTEREST" ANALYSIS

{¶ 18} R.C. 3109.04(E)(1)(a) provides that a trial court can modify the designation of residential parent if it finds that a change in circumstances has

occurred since the prior allocation and that modification is necessary to serve the best interest of the child. The statute further provides that "[i]n applying these standards, the court shall retain the residential parent designated by the prior decree * * *, unless a modification is in the best interest of the child" and one of three circumstances applies: either that (1) "[t]he residential parent agrees to a change in the residential parent," (2) "[t]he child, with the consent of the residential parent * * *, has been integrated into the family of the person seeking to become the residential parent," or (3) that the harm "caused by a change of environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a). Practically speaking, the court must first make a threshold determination that a change in circumstances has occurred. *Neighbor v. Jones*, 9th Dist. No. 24032, 2008-Ohio-3637, 2008 WL 2814311, at ¶ 6–8. If a change of circumstances is demonstrated, the trial court must then determine whether the modification is in the best-interests of the child. Id.

{¶ 19} The factors to be considered with respect to the child's best interest are enumerated in R.C. 3109.04(F)(1)(a) through (j). The trial court found that the best-interest factors that were relevant to the matter included R.C. 3109.04(F)(1)(d) (child's adjustment to home, school, and community), (e) ("mental and physical health of all persons involved"), (f) ("parent more likely to honor and facilitate court-approved parenting time"), (h) (whether any parent has been convicted of an offense resulting in child being an abused child or a neglected child), and (i) (whether the residential parent "has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court[ ]"). Mother does not challenge the trial court's conclusion that these factors were relevant by virtue of the evidence. In addition, Mother has not specifically challenged the trial court's best-interest determinations. Instead, Mother has generally asserted that the evidence did not support the trial court's conclusion that a change in custody was necessary. However, we conclude that there was competent, credible evidence to support the trial court's best-interest determinations.

### Child's adjustment to home, school, and community

{¶ 20} Under R.C. 3109.04(F)(1)(d), the trial court must consider M.M.'s adjustment to home, school, and community. M.M. previously resided with Mother, her older sister, and older brother. During some of this time, M.M. undoubtedly observed her sister's progressive illness and the medical care that was taking place in the home. Father described the atmosphere in Mother's home as unhealthy and dominated by illness and death. Father identified M.M.'s positive changes since residing with him, which included changes in both her physical and

mental well-being. Father described his home as a positive environment in which M.M. could flourish without living under a cloud of illness and fear of death. Father stated that M.M. had previously lived in an atmosphere "where sickness ruled the house, not just the physical sickness but the thought of sickness." Father further stated that the "idea of sickness was all around her." For example, in M.M.'s room there was an IV pole next to her bed. Father has encouraged M.M. to engage in extracurricular activities and to behave as any normal child would of M.M.'s age. Toward that end, M.M. participates in swimming twice weekly and has progressed from level one to level four in her swimming classes. He stated that M.M. was much more comfortable in the water now and that nine months ago, M.M. was afraid to jump in the water. Now, M.M. jumps off of the diving board. He described Mother as being more limiting as to M.M.'s activities. For example, according to Father, Mother discouraged swimming as too dangerous to M.M. "because of the antibodies and disease." Mother stated that M.M. was enrolled in tap dance, tumbling, and ballet classes. She acknowledged that she had reported to doctors that M.M. was sometimes fatigued after her activities.

{¶ 21} The guardian ad litem stated that M.M. had expressed to her that she liked living at her Father's home and that she liked her current school and friends. The guardian ad litem acknowledged that M.M. also expressed a desire to visit with Mother. However, the guardian ad litem felt that it was in M.M.'s best interest to be with Father because he provides a very loving home and a good environment and he communicates with Mother.

{¶ 22} Father also stated that M.M.'s relationship with his current wife was "fantastic" and that his wife loved M.M. as if she were her own child. Father also stated that M.M. is very close to her paternal grandparents and that in the past Mother had done all that she could to keep M.M. away from Father and his family.

{¶ 23} Mother and Father live in different cities with different school districts. Mother stated that M.M. enjoyed the school in her district and had made good friends. In contrast to the guardian ad litem's testimony, Mother stated that M.M. had told her she did not like her current school. Father described M.M. as loving school and being very happy there, where she has made many new friends. He stated that M.M. is reading and enjoys math. He also supported M.M.'s desire to keep in touch with one of her friends from her previous school.

### Mental and physical health of all persons involved

{¶ 24} R.C. 3109.04(F)(1)(e) requires consideration of the mental and physical health of everyone involved. There was significant evidence concerning M.M.'s physical and mental health. With respect to her physical health, Dr. Cooper

White stated that M.M. is healthy and has been weaned from all medical devices and drugs. He also stated that M.M. is at a healthier weight and that there were no limits on her lifestyle. Father stated that M.M. had been overweight when he obtained emergency custody of M.M. and he felt that her fatigue was symptomatic of being overweight and out of shape. Since that time, M.M. has lost weight and has been able to engage in physical activities such as swimming and playing at the park. Father described M.M. as a "ball of energy" and said that there was a "night and day difference" when comparing M.M. at present versus one year before. Father also stated that M.M. is now very confident, and she does not have the same fears or insecurities as she had before. He indicated that school was difficult for her and "tough on her confidence" because she was embarrassed about having to wear the backpack at school and being different from the other children. Father stated that he worked hard to let M.M. know that although her sister was sick, she is not sick. He stated that he reinforces that it is normal to be sick or to have a minor injury and such conditions would pass and are not life-threatening, as they might have been for her older sister. Father stated that he and his wife are helping M.M. cope with her sister's death and its impact on M.M. Father indicated that through much work, M.M.'s attitude has changed with regard to how she feels about herself, how she looks at the death of her sister and her sister's life, as well as her own life.

{¶ 25} Father expressed concern about Mother's mental state and felt that Mother had a need to do all that she could to prove that she was right about M.M.'s illness. Father alluded to the 2005 psychological evaluation of Mother, which he claimed indicated that there were issues concerning Mother's mental health. Father felt that Mother needed the children to be sick because she needed and wanted pity and sorrow. Father also related that Mother's perception of symptoms was more dramatic than his. For example, if M.M. had diarrhea, he saw it as ordinary but Mother did not. Due to Mother's concern about M.M.'s heat sensitivity, Father had to convince Mother to allow M.M. to go on an extended field trip to "Safety Town." Because Mother did not feel M.M. could tolerate the heat in the bus, Father drove M.M. there himself. Dr. Cooper White described Mother as overly vigilant about M.M.'s care.

{¶ 26} The guardian ad litem expressed concern that after the death of M.M.'s sister, Mother was so overcome with grief that she had refocused her energies on M.M., which resulted in "overmedicalizing" her. She felt that Mother needed to obtain counseling to address her issues. The guardian ad litem believed that M.M. had been subjected to many procedures she did not need and had many limitations on her activities. Despite the fact that she could have been a healthy, normal, active child, M.M. was instead restricted to her bed and hooked up to IVs and feedings tubes. The guardian ad litem described Mother as having an

obsessive concern regarding M.M.'s health and said that Mother had a feeling that "there is danger lurking around the corner." She stated that if M.M. sneezes, Mother will call the doctor. She also described Mother as being entrenched in a position that M.M. has mitochondrial disease and is unable to see the "big picture" with regard to M.M. The guardian ad litem was concerned that although she had encouraged Mother to visit with M.M., Mother's refusal to do so was a "protest" about M.M.'s improper removal from her custody. The guardian ad litem was also concerned that Mother did not send Christmas presents to M.M. and instead kept a Christmas tree in her home until May when M.M. visited in her home.

**Parent more likely to honor and facilitate court-approved parenting time/interference with parenting time**

{¶ 27} R.C. 3109.04(F)(1)(f) and (i) require consideration of which parent is "more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights" and whether Mother, as residential parent, has "continuously and willfully denied [Father's] right to parenting time." Father testified that whenever he disagreed about M.M.'s symptoms or care, visitation was taken from him. He stated that "[w]henever I stepped out of line in her mind, I wouldn't see my kids for a week or two." On one occasion, Mother rebuked Father for having sent some information directly to a doctor instead of directing the information to her as she had instructed. Father stated that Mother would not allow Father to be involved in the care of the children if he did not do things exactly the way she told him.

{¶ 28} With respect to Father, the guardian ad litem testified that Father had been very good about trying to make sure that M.M. visited with Mother. Although Father expressed concern about Mother having unsupervised visitation with M.M., the guardian ad litem indicated that Father was willing to follow the recommendations of outside professionals as to visitation.

{¶ 29} The guardian ad litem also stated that she felt that Father would make sure that Mother visits with M.M., whereas there was a pattern of Mother putting impediments in Father's ability to visit, and Mother was not as conducive to trying to facilitate visitation as Father was. The guardian ad litem described Mother as being unwilling to allow Father to make up time when he had been traveling.

**Whether any parent has been convicted of an offense resulting in child being an abused or neglected child**

{¶ 30} R.C. 3109.04(F)(1)(h) requires the court to consider whether any parent has been convicted of an offense resulting in a child being an abused child or a neglected child. The trial court acknowledged that Mother had not been charged

with or convicted of any crime in connection with her care of M.M.; however, it found that the decision of M.M.'s treating physicians to refer the matter to CSB was relevant.

{¶ 31} Upon careful and thorough review of the record, we agree with Mother that serious allegations were made against her that were not substantiated at trial. Thus, while Mother has pointed to evidence that discredits the premise upon which custody was initially transferred to Father, the trial court's determination as to whether a change in custody was in M.M.'s best interest extended beyond the issues that prompted the emergency transfer of custody. In light of all of the evidence in the record, we conclude that the trial court's decision to modify the allocation of parental rights and responsibilities was not an abuse of discretion. We also conclude that the trial court's determination that a reallocation of parental rights and responsibilities was in M.M.'s best interest was not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

Assignment of Error Number Two

The trial court erred in denying the appellant's motion in limine based upon Evidence Rule 703 as well as overruling her objection at trial to Dr. Steiner's testimony.

{¶ 32} In Mother's second assignment of error, she argues that the trial court erred by denying her motion in limine based upon Evid.R. 703 and overruling her objections at the magistrate's hearing to Dr. Steiner's testimony. Mother asserts that Dr. Steiner's testimony was not proper pursuant to Evid.R. 703 because his expert opinions were not based on facts that he observed.

{¶ 33} The magistrate denied Mother's motion in limine and the trial court affirmed the magistrate's denial of the motion. "A ruling on a motion in limine is an interlocutory ruling as to the potential admissibility of evidence at trial and cannot serve as a basis for reviewing error on appeal." *Beggs v. Shue*, 9th Dist. No. 04CA0031, 2005-Ohio-1128, 2005 WL 602692, at ¶ 40. Thus, we will confine our review to whether the trial court erred in overruling Mother's objections to the admission of Dr. Steiner's testimony during the evidentiary hearing.

{¶ 34} Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by [him] or admitted in evidence at the hearing." "An expert witness's opinion 'must be based upon facts within the witness' own personal knowledge or upon facts shown by other evidence.'" *Rasalan v. TJX Operating Cos., Inc.* (1998), 129 Ohio App.3d 364, 370, 717 N.E.2d 1123, quoting *Burens v. Indus. Comm.*

(1955), 162 Ohio St. 549, 55 O.O. 436, 124 N.E.2d 724, paragraph one of the syllabus. "As long as an expert bases an opinion at least in major part on facts or data perceived by him or admitted into evidence Evid.R. 703 has been satisfied." *Farkas v. Detar* (1998), 126 Ohio App.3d 795, 798, 711 N.E.2d 703.

{¶ 35} Witnesses presented at trial can be categorized as either fact witnesses or expert witnesses. A fact witness testifies "with respect to matters relevant to the case and within [his] personal knowledge." *State v. Reinhardt*, 9th Dist. No. 08CA0012–M, 2009-Ohio-1297, 2009 WL 735971, at ¶ 9, citing Evid.R. 402; Evid.R. 602. On the other hand, an expert witness testifies "when the subject matter of the testimony is related to matters that are beyond the knowledge or experience of laypersons; the witness possesses 'specialized knowledge, skill, experience, training or education' that relate to the subject matter; and the witness testifies based on 'reliable scientific, technical, or other specialized information.'" *Reinhardt* at ¶ 9, quoting Evid.R. 702(A) and (C). "Persons who may qualify as an expert in certain circumstances may be called at other times as fact witnesses to testify as to matters within their knowledge." *Reinhardt* at ¶ 9.

{¶ 36} Mother has not identified with particularity the objectionable expert opinions that Dr. Steiner rendered during the hearing. We note that in its journal entry, the trial court erroneously stated that "Dr. Steiner testified that his original diagnosis was Munchausen Syndrome by [P]roxy, but that he later changed the diagnosis to pediatric condition fabrication or falsification." However, the portion of the transcript the trial court cited in support of its finding consists of Dr. Steiner's explanation that a physician had asked him to engage in a consultation to determine whether M.M. was a victim of what was then known as Munchausen Syndrome by Proxy but has subsequently been relabeled and renamed as pediatric condition fabrication, or PCF. On direct examination, Dr. Steiner did not offer an expert opinion as to whether M.M. suffered from mitochondrial disease, whether Mother was diagnosed with PCF, or whether M.M. was actually a victim of PCF. Dr. Steiner related that in the course of that meeting, "[b]ased on the opinion of the physicians at the table[,] it was determined that [M.M.] did not have a mitochondrial disease." However, Dr. Steiner was not asked whether *in his opinion* M.M. had mitochondrial disease. We note that Dr. Steiner was not identified as an expert by Father, and Father did not ask the magistrate to qualify Dr. Steiner as an expert during the hearing. Had Dr. Steiner been qualified as an expert witness and offered an expert opinion on these subjects, he would have been required to disclose the underlying facts and data upon which he based his expert opinion. See *Pakeeree v. Pakeeree* (Mar. 11, 1992), 9th Dist. No. 15186, 1992 WL 48508, at *3. However, the substance of Dr. Steiner's testimony consisted of relating what had happened during the confer-

ence of doctors at Children's during which it was decided that medical treatment should be withdrawn from M.M. and that M.M. should be removed from Mother's custody in order to accomplish that goal. Thus, Evid.R. 703 was inapplicable. See *Reinhardt* at ¶ 10.

{¶ 37} In her merit brief, Mother also contends that "even without Rule 703, almost all of Dr. Steiner's testimony was impermissible hearsay," and hence, Mother's objections to Dr. Steiner's testimony should have been sustained. However, Mother has not developed her argument on appeal. She has neither specifically identified which testimony was hearsay, nor has she offered applicable legal authority to support her argument. To the extent that Mother takes exception to those portions of Dr. Steiner's testimony where he testified as to what Dr. Cohen said, we note that Dr. Cohen's testimony was admitted into evidence and thus the court was able to fully evaluate what Dr. Cohen actually said. Accordingly, we overrule Mother's second assignment of error.

### III

{¶ 38} The trial court's reallocation of parental rights and responsibilities to Father was not an abuse of discretion. The trial court's determination that a reallocation of parental rights and responsibilities was in M.M.'s best interest was not against the manifest weight of the evidence. The trial court did not err in overruling Mother's objections to Dr. Steiner's testimony. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is affirmed.

Judgment affirmed.

WHITMORE and DICKINSON, JJ., concur.